UNITED STATES DISTRICT COURT

_____

TORRELL SAXON

                        PETITIONER

VS.


UNITED STAES OF AMERICA

                       RESPONDENT.

_____

Docket No.13CV4966
AMEND
Petition of
Habeas Corpus
Pursuant to section
18 U.S.C.R 2255


    The Petitioner Torrell saxon,who is a prisoner that resides at Westchester County Jail P.O. Box 10  Valhalla,New York 10595 seeks pursuant to section 2255 title 18 U.S.C.R to Amend this petition of Habeas Corpus file before this hornorable court on July 8,2013 under Docket No.13CV4966.

    Petitioner seekd to modify this Habeas Corpus in accordnace with new discovery base on the following Grounds:

CAUSE OF ACTION
_____

1.Fatico Hearing Minutes held on April 17,2013 and April 23,2013 label Exhibit B.

GROUNDS
_____

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 7/31/2013

Ground one :Willful Misconduct

    Attorney Amy Attias showed willful misconduct during closing statements at the Fatico hearing.See Exhibit B Page 264 Lines 8-11.  Ms.Attias statement is,"I don't think Mr.Saxon's stories makes no sense."

    Also see Exhibit B page 266 lines 12-14 Ms.Attias committed willful misconduct with her closing statement

that did not defend,the defendant.Her statement is,"Maybe Saxon had a gun and they had a gun and everybody else.But "WE" don't know.

Ground two:Affirmative Misconduct

Attorney Amy Attias showed affirmative misconduct when she made this statement at the Fatico hearing showing that she was focus on issues from her own theory of what happen the night of the defendants arrest.See Exhibit B page 255 line 17
Her statement is,"So what I think MAY have happen is this."

Also see Exhibit B page 266 lines 7-9
Attorney Amy Attias commited affirmative misconduct when she made this statement,"the gun,if it was the same caliber gun,I'm not saying that there were two guns.I'm saying that "WE"don't know. "WE" just don't know.

Ground three:Violation of 5th Amendment
Attorney Amy Attias violated Defendents 5th amendment at the Fatico hearing when she made t his statement,"I don't think Mr. Saxon's stories,make no sense." See Exhibit B page 264 Line 9-10

Also see Exhibit B page 260 line 13-14
Attorney Amy Attias further violated the 5th amendment for the defendent when she stated,"So why do I aggressively stipulate-why do I put in reports that put the gun in my hands or his hands?"

Ground four:Serious Misconduct
Attorney Amy Attias committed serious misconduct when she consult with the prosecutor about defense techniques.See Exhibit B page 140 lines 21-22
Her statement,"Judge and actually Mr.Gerber(the A.U.S.A)and I

2

have discussed this,and obviously this is a little bit of and
unuasual defense technique to be introducing a statement thas put
the gun in my own client's hands."

     Also see exhibit B page 140 lines 9-12
The prosecutor knew exactly what she was going to do.Mr.Gerber's
statement is,"the defense is offering,they are both,these accounts
by Mr.Perez they put the gun in the defendants hand,put the gun
in his hand,have him shooting the gun."

     Also see exhibit page 255 lines 11-16
Attorney Amy Attias admits flat out her direct participation in
working with the prosecutor.Her statement is,"Don't want to look
a Gift Horse in the mouth,but there-something was going-something
was wrong,I don't want to-"Mr.Bloom(A.U.S.A)"is looking at me,but
"WE" went through a lot before "WE" achieved that,and I do say I
am-I applaud with every bone in my body both these prosecutors
and their "WORK",but now "WE'RE" fighting over this gun."

     Also see Exhibit B page 139 lines 5-8
Ms.Amy Attias further shows serious misconduct with her statement
that said,"Mr.Gerber,Mr.Calhoun and I have spoken several times
over the last several days and without objection "WE" are going
to.-"


     Ground five:Wide Range of Misconduct Fall
Attorney Amy Attias committed wide range of misconduct fall when
she made the folowing statements at the Fatico hearing.See
Exhibit B page 264 lines 8-10
Her statement is,"inconsistencies with the witness stories,with
the witness stories,with the fact that,frankly,I don't think Mr.
Saxon  Stories make no sense."

     Also see Exhibit B page 251 lines 18-20
The prosecutor made a simuliar statement,"the obvious incentive

the defendent has to lie,is just,just implausible on its face.It
does not make sense."

      Also see Exhibit B page 260 line 13-14
More misconduct on defense attorney behalf,"Why do I put in
reports that put the gun in my hand or his hand?"

      Also see exhibit B page 266 line 12
Ms.Amy Attias acted like the prosecutor with her statement,"So,
you know,maybe,maybe Saxon had a gun."
Defense counsel flat out put the gun on the defendent.She did not
defend,the defendent at all.


      Ground six:Usurpation of Discretional Power of District
Court
Attorney Amy Attias advise defendent in bad faith to do an
innocent proffer.This was the worst thing she had me do.It
completely gave the prosecutor leverage to convict defendent.See
Exhibit B page 255 lines 4-6
Ms.Attias statement,""and I will talk about the aggressive
posture,going to an innocent proffer,twenty five years in federal
court,this is my second time."

      See Exhibit B page 264 line 7-10
Ms.Attias statement,"between the inconsistencies with the witness
stories,with the fact that,frankly,Idon't think mr.Saxon's story
Makes no sense."

      Seeexhibit page 266 line
Ms.Attias statement,'So,you know,maybe,maybe,Saxon had a gun."

      See Exhibit B page 260 line 13-14
Attorney Attias statement,"Why do I out in reports that put the
gun in my hand or his hand?"

      See Exhibit B page 259 line 2-3
Ms.Attias statement,"Judge,and I couldn't flesh out lookout

4

because he doesn't know."

    See Exhibit B page 266 lines 8-9

Ms.Amy attias statement,"I'm saying that "WE"don't know."WE"just don't know."

    Defendent argument was base on the fact that he was robbed and there was a look out for the robbery,the man in the yellow shirt."On a few occasions defendent clearly states that these is a look out.See Exhibit B Pages 204 line 17,page 206 line 3,page 214 line 5,page 212 line 22-25,page 219 lines 4-5 and page 205 lines1-2.

Ms.Amy Attias flat out went against the defendents entire defense.See exhibit B page 259 lines 1-5

Ms.Amy Attias focus on her own theory about there being two guns involve in defendents case.See exhibit B page 255 line 17

Her statement,"So what I think may have happen is this."

    During the Fatico hearing defense counsel repeatedly argue that there was two guns instead of listening to the defendent statement that there was one.See exhibit B lines 19-20

"one is,the defense has suggested repeatedly through this hearing that there were two guns."

At the end of the Fatico hearing defense counsel completely changed her argument,intentionally giving the prosecutor the case with her statement.See Exhibit B page 266 line 7-9

Ms.Attias statement changed to,"was the same gun,if it was the same caliber gun.I'm not saying that there were two guns.I'm saying that "WE"don't know."WE"just don't know."

    The prosecutor Mr.Gerber maxmimize off her statement.See Exhibit B page 231 lines 2 and 5

Prosecutors's question,"And you remember one gun,right?"

Defendents response,"I only remember one."

The defense counsel Amy Attias work together with the prosecutor team that resulted in the conviction of the defendent.the most obvious proof of Usurpation of discretional Power of District court is how right after days of conversations with each other the defense counsel decides to put the gun in the defendents's hand.See exhibit B page 139 lines 5-8

Ms.Amy Attias statement,"Mr.Gerber,Mr.Calhoun and I have spoken several time over the last several days,and without objection, "WE"are simply,rather than calling the witness,"WE"are going to, I am going to move his statement."

See Exhibit B page 140 lines 21-24

Defense counsel statement,"Judge,and actually Mr.Gerber and I have discussed this,and obviously this is a little bit of an unuasual defense technique to be introducing a statement that puts the gun in my own clients hands."

Defendent in good faith trusted the defense counsel and in bad faith she later argue that Saxon the defendent had a gun.See exhibit B page 266 line 12.

Defense counsel statement,"So,you know,maybe,maybe,Saxon had a gun and they had a gun and everybody was shooting at everybody else."

Then the defense counsel applaud the prosecutors team for their work.See exhibit B page 255 line 13-16

Ms.Attias statement,"I applaud with every bone in my body both these prosecutors and their work.

6

## RELIEF BEING SOUGHT

Base on the ground saised above in the Amend petition,
petitioner prays relief for:

1.For the courts to place a stay of any movement,tranfer
or relocation by United States Marshall or any other
appropriate person from Westchester County Jail pending
appeal.

2.For   petitioners immediate release

3.For dissmissal of charges

4.To dibarred Attorney Amy Attias from the federal bar of
attorney and from U.S.Court of appeal.

5. )Other relief that is just and proper.

*Torrell Days*

Pro Se

Sworn to before me on this 29
day of July 2013

THOMAS V RUGGI
NOTARY PUBLIC-STATE OF NEW YORK
No. 01RU6251407
Qualified in Westchester County
My Commission Expires November 14, 8815

7

Exhibit B

Fatico Hearing Minutes

269

| | |
|---|---|
| 1 | MS. ATTIAS:  Thank you. |
| 2 | THE COURT:  Prior to sentencing. |
| 3 | MS. ATTIAS:  I think that we have over a month |
| 4 | until sentencing. |
| 5 | THE COURT:  Okay.  Anything further? |
| 6 | MR. GERBER:  No, your Honor. |
| 7 | MS. ATTIAS:  Judge, do you want the little -- |
| 8 | THE COURT:  Actually, I think I have some of the |
| 9 | original exhibits.  I don't generally keep these.  I just |
| 10 | keep copies.  Do you want these back?  I have at least three |
| 11 | of your exhibits.  You can submit copies. |
| 12 | MS. ATTIAS:  This you can keep.  And this I do |
| 13 | not, I'm sorry, I did not make a copy of.  I don't mind your |
| 14 | holding on to it. |
| 15 | THE COURT:  I'm not going to hold on to an |
| 16 | original.  Why don't you submit a copy? |
| 17 | MS. ATTIAS:  I'll scan it to you. |
| 18 | THE COURT:  Okay.  Does anyone know when we're |
| 19 | going to get the PSR? |
| 20 | MR. GERBER:  No, your Honor. |
| 21 | MS. ATTIAS:  I would guess -- I think the |
| 22 | sentencing is like the 28th. |
| 23 | THE CLERK:  The 30th. |
| 24 | THE COURT:  We are scheduled for sentencing on |
| 25 | May 30 at 10:30 a.m. |

270

| | |
|---|---|
| 1 | MS. ATTIAS:  I'll probably be in touch with |
| 2 | Mr. Fisher, Judge.  If you want as quickly as possible, I |
| 3 | can tell him.  I don't know, I would think that he would be |
| 4 | interested in your Honor's decision also because it might |
| 5 | affect his recommendation.  I don't know about that. |
| 6 | THE COURT:  I don't know how that would affect his |
| 7 | recommendation, but again the parties should get me the |
| 8 | transcript when you can, and the sooner I get that, the |
| 9 | sooner you'll get my decision.  Okay? |
| 10 | MS. ATTIAS:  Thank you. |
| 11 | MR. GERBER:  Thank you, your Honor. |
| 12 | THE COURT:  Okay, folks.  Thank you. |
| 13 | C E R T I F I C A T E |
| 14 | I, Angela A. O'Donnell, certify that the foregoing is a |
| 15 | correct transcript from the record of proceedings in the |
| 16 | above-entitled matter. |
| 17 | |
| 18 | _____ |
| 19 | Angela A. O'Donnell, RPR, Official Court Reporter |
| 19 | United States District Court, Southern District of New York |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

271

| | | |
|---|---|---|
| 1 | INDEX OF EXAMINATION | |
| 2 | Examination of: | Page |
| 3 | MICHAEL BROWNSTEIN | |
| 4 | Direct By Ms. Attias . . . . . . . . . . . . . . | 148 |
| 5 | Voir Dire By Mr. Gerber . . . . . . . . . . . . | 158 |
| 6 | Direct By Ms. Attias (Cont'd) . . . . . . . . . . | 159 |
| 7 | Cross By Mr. Gerber . . . . . . . . . . . . . . | 169 |
| 8 | TORRELL SAXON | |
| 9 | Direct By Ms. Attias . . . . . . . . . . . . . . | 174 |
| 10 | Cross By Mr. Gerber . . . . . . . . . . . . . . | 220 |
| 11 | Redirect Ms. Attias. . . . . . . . . . . . . . | 241 |
| 12 | Recross Mr. Gerber . . . . . . . . . . . . . . | 244 |
| 13 | | |
| 14 | GOVERNMENT EXHIBITS | |
| 15 | Exhibit No. | Received |
| 16 | | |
| 17 | 151,152, 153 | 172 |
| 18 | DEFENDANT EXHIBITS | |
| 19 | Exhibit No. | Received |
| 20 | | |
| 21 | E | 159 |
| 22 | A | 199 |
| 23 | | |
| 24 | | |
| 25 | | |

1  simple. That's why I took the aggressive posture of putting
2  in another witness's testimony. That's why I took the
3  aggressive posture of the Innocence profiler in the first
4  place. That's why I called their first officer, frankly,
5  when he testified the scene was serine and quiet, I was
6  shocked because you heard the 911 tape, Torrell was going
7  crazy, he was screaming like a crazy man the whole time.
8          And once you asked him about his statement, yes,
9  it does seem like somebody would say, but they jumped me,
10 but they jumped me. Well, he does tell the police officer
11 that, and in his drunken condition I would suggest that, as
12 drunk as he was, and everybody agrees on that, he could not
13 have made up -- he wasn't going to start making up that
14 defense in the condition that he was in before he actually
15 fell asleep on bench in the police station. So the fact
16 that he did say from the start, yes, I was jumped, and then
17 he kind of fell out because he was so intoxicated, suggests
18 that this is not something that he made up later on as a
19 defense, and the government has to prove this by a
20 preponderance of the evidence. I know it's not a big --
21 doesn't have to -- the scales don't have to weigh a lot in
22 one direction or the other, but I think that, when you look
23 at all the evidence -- and by the way, the tampering of the
24 door, I don't know who did that, but that is really bizarre.
25 That's just a comment I have to make on that. I don't know

1  who did it. I'm certainly not suggesting the police did it.
2  I'm not suggesting -- I don't know who did it.
3          THE COURT:   That doesn't lean one way or the
4  other.
5          MS. ATTIAS:   It doesn't matter. It doesn't
6  matter. But perhaps somebody could have figured out if it
7  was the same gun, if it was the same caliber gun. I'm not
8  saying that there were two guns. I'm saying that we don't
9  know. We just don't know. Both experts agreed, I think,
10 they could not conclusively say that it was something -- a
11 gun of the same caliber.
12         So, you know, maybe, maybe, maybe, Saxon had a gun and
13 they had a gun and everybody was shooting at everybody else.
14 But we don't know. And Crime Scene could have helped us out
15 in a gigantic way with that by doing a proper investigation,
16 which they did not.
17         So your Honor has to weigh all of this testimony
18 and find out if the government has proven this evidence by a
19 preponderance, proven its point by a preponderance of the
20 evidence and I would suggest to you that they have not.
21         By the way, your question about what was the gun
22 doing so far away from this laundry basket. And I did, I
23 heard Mr. Gerber's answer, and, of course, he doesn't know.
24 He can only wonder and suggest something. But what I would
25 say is, you've got cops on the scene. These are not babies.

1  They live in a high -- this is a high-crime, tough place to
2  be a cop. They're not going to take the gun from one place,
3  make it safe and take out the bullets and then stick it back
4  in a different part of the room from where it was, because
5  that's just -- unless -- that would be really bad. That
6  would be a very bad thing to do.
7          But what we do have is the gun sitting by itself
8  with no dirty laundry around, no clean laundry around. No
9  clothing anywhere. So, to me, that says that it's not going
10 down the way that the people say it's going down. Artola
11 could not remember exactly where the gun was. He knew there
12 was laundry somewhere, he couldn't say where it was.
13         So that's what I have for you, unless you have any
14 other questions for me.
15         THE COURT:   I do not.
16         MR. GERBER:   Your Honor, Mr. Bloom asked me to
17 give his apologies to the Court, he had to step out for a
18 personal matter, and I wanted just to communicate that. I
19 know it's very late. The defense did speak at some length.
20 Do I have time for one or two points?
21         THE COURT:   You have time for one-minute worth of
22 points.
23         MR. GERBER:   I would just say then that as to --
24 we have not been asking the Court to rely on Mr. Perez's
25 account, we think that there's enough from what just the

1  government put forward, is more than enough to show by a
2  preponderance what happened here that the defendant had the
3  gun and shot the gun.
4          I would just say that, if the Court is going to
5  look at Mr. Perez's statement, I would just say that there
6  is actually tremendous corroboration. That statement
7  corroborates Mr. Morelia's account in many, many, many ways.
8  I think almost every material way it corroborates his story.
9  There are minor inconsistencies, that is hardly surprising,
10 given the nature of human memory, given the fact it's over a
11 year ago, given the highly traumatic nature of this
12 incident.
13         I would urge the Court, if it's going to look at
14 that statement, if it compares his statements to
15 Mr. Morelia's testimony, I think the Court will find there's
16 actually overwhelming corroboration of the Government case.
17         THE COURT:   Thank you. I will take this matter
18 under advisement, and you likely will not get the decision
19 until sentencing, which I believe is coming up fairly soon;
20 correct?
21         MS. ATTIAS:   I think we put it on for late May,
22 Judge. I was wondering if we could know what the Court
23 thinks, because I think it's going to change what I argue.
24         THE COURT:   Okay. I'll get you an answer soon as
25 possible.

261

1  the gentlemen in that apartment.
2          MS. ATTIAS:  I believe so.  I believe the woman
3  brought him there to --
4          THE COURT:  And in a couple of moments that this
5  apparently took place over, they bring him into the
6  apartment, there's shots fired and between the five of them
7  or the six of them determine, well, let's call the cops.
8  That's the theory.
9          MS. ATTIAS:  Yes.  And I would have fleshed that
10  out more, frankly.  Mr. Gerber tells you that the woman is
11  available.  She has counsel.  She's also, you know, she is
12  represented by counsel.  V-1, Mr. Perez Suarez, represented
13  by counsel.  Mr. Moreria who testified represented by
14  counsel.  So the government can call whoever they want.
15  They only called one person from inside the apartment.  I
16  put in the reports to point out a couple of significant and
17  interesting contrasts.  I'm just going to go through them.
18          One is in the struggle over the gun.  The reports
19  that I put in this morning on Rodrigo son, and I'm sorry, I
20  know it's well after five, if you take a look at those, he
21  talks about how the man would not let go of the gun, and in
22  both reports he's consistent about that, the man would not
23  let go of the gun and he had to struggle over the gun and it
24  ended up in the laundry basket.
25          Well, Mr. Moreria who testified at page 20 of the

262

1  transcript, testifies that they're struggling outside
2  bedroom one, they fall to the bed, the gun falls into a
3  basket and then they get him down to the floor as contrasted
4  to -- and that's at page 20 of the transcript as opposed to
5  Rodrigo son's version of what happens with the gun.  Does it
6  fall out right away or are they struggling, struggling,
7  struggling trying to get it out of his hand?  That's one
8  interesting just difference.
9          But, more importantly, where was everybody when
10  the shots go off, and could this be a bunch of guys getting
11  together and quickly coming up with a story but then the
12  story kind of goes wrong because they don't get it right?
13          So, Moreria testifies the other day that Saxon is
14  holding the gun to -- I'm going to call him V-1, because
15  it's just easier for me, that's how I've been thinking.  Of
16  him, Rodrigo son, V-1, Saxon is holding the gun to Rodrigo
17  son's head.  Moreria said he comes, he approaches, he comes
18  up the hall, and that's when two shots go whizzing right by
19  Moreria and Moreria gets right into the struggle, and as
20  Moreria and V-1, Rodrigo son, are struggling, that's when
21  the shot goes off in the door.  And the two documents that
22  went in this morning, Defense B and C, I think they are B
23  and C, the first one, the statement to the police in
24  Middletown, he says that the gun is to his head, V-4, that
25  Rodrigo son approaches him.  We don't know how close.

263

1  Moreria approaches him, and then the gun went off twice by
2  his head.  He screams for help.  He, Moreria -- sorry,
3  Rodrigo son is holding the hand and the door shot happens.
4  At that time, his dad, Rodrigo father and Moreria arrive.
5  That's what Rodrigo son first tells the police.  So he says
6  he's in the front, that the gun is to his head, Rodrigo --
7  Moreria starts to -- approaches him, we don't know what that
8  means exactly.  Two shots whiz by, a third goes into the
9  door and then the struggle happens.  And that's Defense B.
10          And then, in Defense C, which is a statement to
11  Agent DiGirolamo, memorialized by Agent DiGirolamo, he says,
12  importantly, that I'm looking at paragraph six of that piece
13  of evidence, that they're in the front, that the "stay
14  mother fuckers" happens, then the suspect has the gun to his
15  head, he fires two shots and this is just Rodrigo son
16  standing in the front.  Two shots were fired.  Rodrigo son
17  and the defendant struggle.  The door is hit, and that's
18  when everybody comes up the hall and gets into it.  And
19  that's when he has everybody coming up the hallway.
20          So, I think it's quite important that Moreria
21  takes the stand here and says, he's holding the gun to his
22  head, Saxon is holding the gun to Rodrigo son's head, I come
23  running up the hallway, I almost get shot, and I jump back.
24  And that's why I'm asking you to look at the pictures of the
25  hallway, that skinny, little hallway in those pictures, two

264

1  shots whizzing right by and this guy jumps back.
2          First of all, where did that shot go?  A guy with
3  33 years as a police officer can't find a third impact mark
4  anymore.  There's only two bullets that are making the
5  impact marks; the door and then shots B and C, the ricochet
6  shot.  So where is that third impact mark?  I don't know.
7          But this is all, Judge, between the
8  inconsistencies with the witnesses' stories, with the fact
9  that, frankly, I don't think Mr. Saxon's stories makes no
10  sense, and I do think that there is a reason for them to
11  call 911, and the burden is on them to prove that he had the
12  gun.
13          So, they could have fingerprinted the cartridges.
14  They could have fingerprinted what was inside the gun.  They
15  could have done more testing and they didn't.  And they
16  could have called the woman inside the apartment.  That was
17  always a big bone of contention.  Who's the woman.  They
18  could have called everybody that they wanted.  Their choice
19  to only put one person on the stand who was inside that
20  apartment I think clearly is a choice based on -- I'm not
21  inside their heads, calling one person in the apartment when
22  there's at least four, five, six people in there shows, says
23  to me just in my own experience that there are big problems
24  with their case and that's why they're choosing to keep it
25  as simple as possible.  Because the truth is, it's not

1   have been from near the kitchen. So, we don't know where it
2   was from, but I think that there are giant holes in the
3   story that amount to a lack of proof.
4           So I think that obviously there was a struggle
5   over a gun, the only question is was it the defendant's gun
6   or somebody else in the apartment? And that gets to the
7   question of why did they call 911 if shots were fired and
8   they were the bad guys jumping him and they're illegal? Why
9   are they calling 911? And I do have a suggestion about
10  that. If this was indeed -- Officer Brownstein testified
11  that there are many drug spots, drug houses in the
12  neighborhood, one of them was 120 Wickham. Mr. Saxon told
13  you that he first went to 120 Wickham because the calls on
14  his cellphone that said, do you have any work, can you bring
15  us -- if you're around, can you come over to 120 Wickham?
16  He did go to 120 Wickham. 120 Wickham, which Brownstein
17  tells us is a drug spot, is empty. He continues going up
18  the street and that's when he bumps into the woman.
19          So why would they call 911? Well, if they took
20  his pills, if there was a weapon in the house, if there are
21  shots fired, he remembers one. There are clearly at least
22  two. We don't know if there was a third, the third shell
23  casing is still inside the gun. It looks like it's likely
24  that three were fired in the house that night. Strike A,
25  strike B, C. But we don't know where any of the termination

1   points are, and that's really weird. Where's the bullet in
2   bedroom one, or where's the termination point, the terminal
3   point?
4           So why would they call 911 if they're illegal and
5   if there's stuff going on in their house, because if it's a
6   drug spot, maybe that's where the trajectories -- where else
7   would the bullet be? Maybe they grabbed things before the
8   cops come there, maybe it's better to call 911 yourself and
9   you clean up your house yourself before the police come
10  rather than the police coming. Because somebody in the
11  neighborhood is going to call 911. There are three hots
12  fired and it's midnight.
13          And, by the way, I do want to speak to your
14  question on the yellow-shirt guy. He shows up on there
15  around 12:09 and this incident is around 12:00 o'clock. So
16  he's outside afterward. So, by that point, it seems as if
17  Mr. Saxon is down on the ground being held down, and that's
18  when yellow shirt guy is outside; 12:09, 12:16, 12:18 around
19  there.
20          THE COURT: The reason I ask based on Mr. Saxon's
21  testimony when he was describing what was going on, it
22  appeared as though he was saying that the gentleman in the
23  yellow shirt came out, essentially scoped out the situation
24  before he arrived and then was a lookout while the robbery
25  was taking place, if you will. That's not the case.

1           MS. ATTIAS:  I couldn't -- I don't think so,
2   Judge, and I couldn't flesh out lookout because he doesn't
3   know, but I think that he would have liked you to believe
4   that they were selling his pills, but obviously I have no
5   proof of that.
6           So why would they have called 911? Because
7   somebody was going to. Shots fired inside the apartment,
8   this way at least they call, they know they're coming, and
9   where are the bullets? If it didn't hit the wall in bedroom
10  one, and it didn't, and when the agent went back in
11  December, fine, when the expert went back in December,
12  furniture had been moved, but when crime scene was there, he
13  was looking around, he had his dowel through the hole and he
14  couldn't find any terminal point, which means it had to be
15  in the room but they didn't find it.
16          THE COURT: Why does that matter?
17          MS. ATTIAS: Well, because, if, in fact, they're,
18  quote unquote, sort of cleaning up the apartment before the
19  cops come, that's another reason why they might choose to
20  call the apartment -- to call 911 because there are shots
21  fired. The police are going to be coming.
22          THE COURT: Wouldn't they start with the gun if
23  that's what they're trying do?
24          MS. ATTIAS: Well, clearly -- there had to be a
25  gun, so the gun had to be somebody's. And that's why -- let

1   me get to this, Judge.
2           I asked from the start for this gun to be
3   fingerprinted, and the government never did. Ultimately,
4   Mr. Gerber, who took over the case, had, at my request,
5   absolutely had the gun fingerprinted and no prints of value
6   were found.
7           Now, they could have printed all kinds of things.
8   Somebody had to load that gun on those complete cartridges,
9   on the bullets, perfect surface for taking prints. The
10  bottle could have been printed. The latex gloves could have
11  been printed. Latex is a surface, as the officer said, you
12  could get prints off the inside. They don't do that.
13          So why do I aggressively stipulate -- why do I put
14  in reports that put the gun in my hand or his hand? Because
15  when I look at the witness who did come into court, Morelle,
16  and I contrast that to Perez-Suarez's statements, they're
17  different in a couple very important respects. I hate to
18  sort of argue conspiracy theory, but in a way, that is kind
19  of what I'm saying, that the people in the apartment jump
20  him, they are told by the woman in Spanish, which he doesn't
21  speak, that he has pills on him, they rush him, he's so
22  crazy and drunk that he's fighting back. Shots are fired.
23  The government has to prove it's his shots fired not their
24  shots fired.
25          THE COURT: So this was a crime of opportunity for

253

1  minding their own business. They were minding their own
2  business, and the defendant came into that home and shot at
3  them. One or two other points.
4          THE COURT: Let me ask you this: Why? Why did he
5  go into that apartment shooting?
6          MR. GERBER: We don't know the answer to that
7  question. I will say that I think that I think there's
8  uncontested, the defendant was incredibly, was quite drunk,
9  and so, it is possible he went into the wrong apartment. It
10 is possible he went in there to rob them. There's also this
11 business about his seeing the person who he believed raped
12 his sister in the apartment, and that may have led him in
13 his drunken state to, to, to -- he was looking for this
14 person, so he went in there shooting. Those are all
15 possibilities. But we don't know the answer to that
16 question.
17         THE COURT: Okay.
18         MR. GERBER: Just one or two final points.
19         One is, the defense has suggested repeatedly
20 through this hearing that there were two guns. I just want
21 to point out, there is zero evidence, zero evidence of two
22 guns. I mean, the ballistics evidence is completely
23 consistent and supports one gun. I think it supports that
24 because I think it's true. But I just want to point out
25 there is zero evidence of two guns, and the defendant

254

1  himself only remembers one gun. And the ballistics evidence
2  is completely consistent with that.
3          One final point. You know, the police walk in
4  there, and the Court was asking the defendant about this,
5  the police walk in there, and on the defendant's account,
6  he's the victim here, he's been attacked, attacked, shot at.
7  What does a victim do in that situation when the police show
8  up? Maybe he says, thank goodness you're here. Maybe he
9  says, please, arrest these people. But to say nothing? To
10 be silent? I mean, these individuals called 911. They
11 wanted the police there. They called the police. He says
12 he's the victim, but when the police show up, he says
13 nothing. We respectfully submit that that is quite, quite
14 telling here.
15         Your Honor, we believe that, at the very least by
16 a preponderance we have shown that the defendant went into
17 that house, had a gun and was shooting.
18         Thank you.
19         THE COURT: Thank you.
20         Ms. Attias, can you tell me just as concisely as
21 you can, what is your theory here?
22         What happened that night?
23         MS. ATTIAS: I just want to clarify, I never said
24 there were two guns. My theory here is that they can't
25 prove he had the gun. I'm going to tell you, if this had

255

1  been a fuller trial, there were more witnesses, obviously
2  you see that I have taken an extremely aggressive posture in
3  calling their witnesses to sort of prove a negative in my
4  case, and I will talk about the aggressive posture, going to
5  an innocence proffer, twenty-five years in federal court,
6  this is my second time.
7          I don't think we can ignore the fact that based on
8  everything that came before we got to your Honor's
9  courtroom, that Mr. Saxon on a gun charge where he's facing
10 15 years minimum because he's ACCA if given a pill sale. I
11 don't want to look a gift horse in the mouth, but there --
12 something was going -- something was wrong. I don't want
13 to -- Mr. Bloom is looking at me, but we went through a lot
14 before we achieved that, and I do say I am -- I applaud with
15 every bone in my body both of these prosecutors and their
16 work, but now we're fighting over this gun.
17         So what I think may have happened is this: I
18 think Mr. Saxon was walking along the street drunk trying to
19 sell his pills, bumped into this woman he knew from several
20 years earlier. I think she took him to sell the pills. He
21 walked into the apartment. And I don't know why he would
22 have gone to rob anybody or to find someone who might have
23 raped his sister two years earlier or whenever it was, it's
24 not in the record, sometime earlier. I think he followed
25 this woman in because he was drunk and he wanted to sell his

256

1  pills. I think they were probably worth more than $50 just
2  from the math you were asking him about. But not a
3  tremendous amount. He was drunk, he was trying to make some
4  quick money selling pills. So he went in, and I think the
5  guys in the apartment, when the woman was speaking Spanish
6  with the guys in the apartment and Mr. Saxon didn't
7  understand, I think that's what probably she was telling him
8  that he has some pills on him, and I think that based on
9  that they did rush him and they did jump him.
10         Was the gun theirs? I don't have to prove that.
11 I can't prove that. But I have a million questions about
12 the holes in their evidence.
13         So I just want to show you People's, Government's
14 110, 111 and Defense E. I entered Defense E because they're
15 really the pictures of the hallway. That's what I was most
16 interested in. I don't care where the table or the
17 refrigerator is. I want you to see that tiny, little,
18 skinny hallway.
19         And, by the way, why don't we know how wide it is?
20 Why don't we know how long it is? Crime Screen did a
21 horrible job here. I was astounded when I saw there were no
22 measurements of anything. Crime Scene could have told us
23 how wide that was and how long it was. The Government's
24 expert testified the strike that hit the kitchen floor was
25 either from the hallway back near bedroom one or it could

249

1  one exception, I'm sorry.  Yes.  We also spoke with the
2  woman who was in that apartment that night and she is, to
3  the best of my knowledge, here legally.  She's a US citizen,
4  I believe.  But the men were all here illegally.
5         And I just want to emphasize, I mean, what does it
6  take for someone who's here illegally to call 911 to urge,
7  to beg the police to show up?  I think it takes a tremendous
8  amount, and why would someone who's here illegally called
9  911?  Because that person is scared out of his mind, he has
10  been attacked and he's desperate for the police to arrive to
11  protect him.
12         THE COURT:  Why don't you explain for me if you
13  can the government exhibits which depict the gun which
14  appear to be in a portion of a bare floor which, at least to
15  my mind, appears to be inconsistent with the testimony that
16  the gun was tossed into a laundry bag or a laundry basket.
17         MR. GERBER:  Your Honor, I'm not sure when exactly
18  those photographs were taken.  I don't know the answer.  I'm
19  speculating here.  It may very well be that the police who
20  initially arrived sort of took control of the gun.  They
21  probably made it safe right away.  They may have put it down
22  on the floor.  I think there's just -- the record is
23  incomplete on that point.  Certainly is quite plausible, to
24  my mind at least, they secured the gun, made it safe, and
25  then rather than putting it back on the laundry basket, you

250

1  know, put it on the floor.
2         THE COURT:  Let me ask you this also:  The
3  individual identified, by Mr. Saxon anyway, as the lookout,
4  the gentleman depicted in the cameras as wearing a yellow
5  shirt, have you identified him as one of the individuals
6  that was in the apartment?
7         MR. GERBER:  Your Honor, we don't know who that
8  person is in the sense that, we have looked at the video, we
9  don't recognize him.  We can frankly barely make out his
10  features.  So I'm not -- we identified various people who
11  were in that apartment.  Officer Artola testified there was
12  someone who, when he arrived on the scene, who directed him
13  inside.  It's not clear to us, frankly, who that is.  It may
14  have been this Antonio Merlo.  To be clear, it's not clear
15  whether it was him or someone else.  But, again, quite
16  frankly, we don't think we can tell who that person is,
17  who's outside there.  I guess the person's a lookout.  First
18  of all, they called 911.  I don't really understand the
19  defense theory here; he was a lookout to watch for the
20  police and they called the police?
21         THE COURT:  Have you worked out a timeline, in
22  view of what happened that evening based on what's on the
23  cameras, you know, from the moment that we first see this
24  individual outside of the home, the gentleman wearing the
25  yellow shirt, to your knowledge, was that before or after

251

1  that you believe Mr. Saxon first went into that apartment?
2  If you know.
3         MR. GERBER:  Your Honor, we don't know.  And,
4  frankly, we, after looking at the video, we're not really
5  sure what to do with it, because we couldn't make out who
6  was who.  We couldn't make out faces.  That individual who's
7  there, not even clear to us he's involved in this case in
8  any conceivable way.
9         I understand that the defense, Mr. Saxon, have
10  said various things about who's doing what, where and when.
11  Frankly, in looking at the video, we just didn't see that.
12  But the answer to your question, your Honor, is, no, we
13  don't have a timeline that relates the 911 call and the
14  events in the apartment to the video footage.
15         THE COURT:  Okay.
16         MR. GERBER:  Let me just very quickly say a word
17  about the defendant's story here.  We would respectfully
18  submit that that story, in addition to the obvious incentive
19  the defendant has to lie, is just, just implausible on its
20  face.  It does not make sense.  You have apparently men in
21  the apartment sort of on the fly, it was not planned out,
22  they learned from a woman who stops by the defendant has $50
23  worth of pills, they then jump him, apparently leaving
24  him -- there are four or five of them, he's drunk, but he
25  has two free arms to grab a gun.  I'm not sure what the

252

1  other people were doing.  Defendant says they were grabbing
2  at his waist.  They would have grabbed his arms.  They would
3  have grabbed his arms.  I mean, how could I have two free
4  hands to fight over a gun?  The defendant can't account for
5  the other -- we know at least two shots were fired, we have
6  testimony as to three, but at least two.  The defendant
7  cannot account for that.  According to the defendant, the
8  shot that was fired into the kitchen was fired literally in
9  the opposite direction.  His back is to the wall.  His back
10  is to the front door.  The shot goes from the front to the
11  back.  And on defendant's account, the people in that
12  apartment, they're both bumbling idiots and they're master
13  criminals.  He wants to have it both ways.  Right?  When
14  they first attack him, apparently they are just the worst
15  criminals in the world.  There are four or five of them,
16  they've got a gun, yet they create a situation in which
17  they're fighting with him over the gun, they're shooting
18  up their own place.  That's these individuals as bumbling
19  idiots.  Then apparently once they get him down, I guess
20  they were master criminals where they I guess call 911 and
21  make up a story.  They -- the defendant has insinuated that
22  evidence was tampered with, that these people they
23  coordinated their stories, they're lying.  I mean, the whole
24  thing didn't hold together, and the reality is, they're not
25  bumbling idiots or master criminals, they're people who were

245

Saxon - Recross (Gerber)

1    MS. ATTIAS:   Nothing else, Judge.

2    THE COURT:   Mr. Saxon, you may step down.

3    (Witness excused)

4    THE COURT:   Ms. Attias.

5    MS. ATTIAS:   Defense rests.

6    THE COURT:   Okay.  And nothing further from the

7  government?

8    MR. GERBER:   That's correct, your Honor.

9    THE COURT:   Okay.  We have a few minutes, do the

10 parties wish to make any comments by the way of closing

11 arguments?

12    MR. GERBER:   Yes, your Honor.

13    THE COURT:   If you want.

14    MS. ATTIAS:   Yes.  I would like to also.

15    THE COURT:   Okay.  Mr. Gerber.

16    MR. GERBER:   Your Honor, is it okay if I move the

17 podium around?

18    THE COURT:   Yes, you may.  Let's see if we can't

19 wrap up both of these by 5:00 o'clock.

20    MR. GERBER:   Your Honor, the evidence before the

21 Court shows that the defendant had a gun and he fired a

22 gun.  The defendant was first pointing a gun at Rodrigo

23 Perez, Mr. Moreria stepped forward, defendant shot at him.

24 When he moved his arm to fire those shots, Perez grabbed

25 arm, grabbed the defendant's arm together with Mr. Moreria,

246

1 Mr. Perez' father and a person name Isidro struggled with

2 the defendant.  During that struggle, a third shot went off.

3 There had been two shots initially, a third shot went off.

4 The bullet went through the door into Moreria's bedroom.

5 They fell into that bedroom.  They were able to hold the

6 defendant down, he let go of the gun, they called 911.  The

7 police arrived, they recovered the gun as well as three

8 shell casings from the apartment.

9    Now, we believe that we've proven this beyond a

10 reasonable doubt, but that's not our burden here.  Our

11 burden is to prove it by a preponderance that it's more

12 likely than not that the defendant possessed that gun and

13 fired that gun.  And we believe that we've proven this with

14 Mr. Moreria's testimony, we've proven this with the 911 call

15 and we've proven this with the ballistics evidence.  The

16 defendant called Dr. Kammrath to the stand.  Nothing she

17 said is inconsistent with the Government's case.  There's

18 nothing she said that's inconsistent with the Government's

19 case.  In fact, much of what she said corroborates our

20 position.  The same is true of Officer Artola and Officer

21 Brownstein.  The only evidence to the contrary is offered by

22 the defendant himself, and that story is not credible, is

23 not believable.

24    First, with respect to Mr. Moreria, the Court

25 heard his testimony, observed his demeanor.  We respectfully

247

1 submit that he testified credibly.  His story is

2 corroborated in many different ways by the ballistics

3 evidence.  Moreria says there were three shots and there

4 were, in fact, three shell casings recovered.  There's no

5 dispute on that.  Moreria said that these shots came from

6 the gun in the defendant's hand.  It is stipulated that

7 Exhibit 1 was recovered from the apartment, Officer Artola

8 described the police arriving and seeing the gun.  Mr. Klees

9 determined that the three shell casings were fired by

10 Exhibit 1.  Dr. Kammrath does not dispute that.

11    Mr. Moreria says that the defendant shot him from

12 the front of the apartment to the back, and Mr. Klees

13 testified that a shot was fired from the front to the back.

14 Again, no dispute on that.  And Dr. Kammrath agrees with

15 that.  Mr. Klees concluded that the mark on the floor of the

16 kitchen was caused by a small bullet, a .22 or .25.  Again,

17 there's no dispute, Dr. Kammrath agrees, and Exhibit 1 is a

18 .22 caliber gun.  Mr. Moreria says during the struggle the

19 gun was up against the door.  The third shot was fired when

20 the gun was up against the door to his room.  Mr. Klees

21 testified the gun that a shot went through the door and that

22 the gun was close to the door.  Again, there's no dispute on

23 that.  Dr. Kammrath agrees with that.

24    Now Mr. Moreria is here illegally.  He has gotten

25 on the stand and admitted his crimes.  It is true that he

248

1 has a nonprosecution agreement.  It gives him no protection

2 from deportation.  This is someone who could have refused to

3 cooperate.  He could have disappeared.  Instead he is

4 testifying.

5    Why did he testify?  He testified because he's a

6 victim here, because the defendant came into his home and

7 shot at him.  And then there's the 911 call.  911 call is

8 independent evidence of the defendant's guilt.  That 911

9 call, that account of what happened is credible.  I mean,

10 the Court heard Mr. Perez on that call.  He sounds -- we

11 submit he sounds scared.  He sounds like someone who is

12 desperate for the police to arrive.

13    THE COURT:   Is Mr. Perez here legally?

14    MR. GERBER:   No, he is here illegally, your Honor.

15 And, in fact, in Defense Exhibit, I believe it's C, the

16 report from Special Agent DiGirolamo that is memorialized

17 that Mr. Perez is here illegally.

18    THE COURT:   What about his father?

19    MR. GERBER:   I'm sorry, your Honor?

20    THE COURT:   His father.

21    MR. GERBER:   His father is also here illegally.

22    THE COURT:   Are any of the individuals in that

23 apartment that evening other than Mr. Saxon here legally?

24    MR. GERBER:   Individuals whom we spoke with who we

25 found and spoke with are all here illegally.  Except, with

241

Saxon - Cross (Gerber)

1    THE WITNESS:   When that -- that was just a few
2  months ago, right before trial, when we were supposed to go
3  to trial.
4    THE COURT:   Okay.
5    MS. ATTIAS:   I have a few questions.
6    THE COURT:   Redirect.
7    MS. ATTIAS:   Yes, please.
8  REDIRECT EXAMINATION
9  Q.   Torrell, you testified on cross that you remember more
10  about the case now than you did shortly after your arrest;
11  why is that?
12  A.   Because I've reviewed a lot of the stuff, a lot of
13  things started coming to me.   Even though in the innocent
14  proffer I told them I didn't remember nothing until they
15  started asking me questions and giving me papers.   They was
16  like, do you remember this?   Then stuff started coming back
17  to me.
18  Q.   When we went into what you're calling the innocence
19  proffer, were you asked a lot of questions by the
20  government?
21  A.   Yes.
22  Q.   And did you start to remember more --
23  A.   Yes.
24  Q.   -- during that?
25  A.   Yes.

242

Saxon - Redirect (Attias)

1  Q.   Now when you said they took, meaning the people in the
2  apartment took your pants, your hat, what do you mean they
3  took it?   They kept it?   They took it and you don't know
4  what happened to it?   What do you mean?
5  A.   They took it off of me, they took my clothes off.   They
6  stripped me.   They was taking -- they took my pants off,
7  they pulled it over my boots.   When I first came in, they
8  was going through my pockets.   They ripped my jacket off and
9  my hat fell off, all that stuff was gone off me.
10  Q.   And the Judge, in response to the Judge's questions
11  about whether you told the police that you had been jumped,
12  did you make a statement in the police station shortly after
13  you were arrested?
14  A.   Yes.
15  Q.   And what did you say there?
16  A.   I told them.
17    MR. GERBER:   Objection, your Honor.
18  A.   I told them I was robbed.
19    MR. GERBER:   Objection, your Honor.
20    THE COURT:   Overruled.
21  Q.   You can answer.
22  A.   I told them that I was robbed.   I told them that I was
23  attacked and I was robbed.
24  Q.   And what was your condition while you were making that
25  statement?

243

Saxon - Redirect (Attias)

1  A.   I was drunk.   Intoxicated.
2  Q.   And was the statement stopped because of your
3  intoxication?
4  A.   Yes.
5  Q.   Now, just very briefly, do you remember hearing the 911
6  tape played here last week?
7  A.   Yes.
8  Q.   And in the 911 tape, do you remember hearing you
9  screaming?
10  A.   Yes.
11  Q.   And do you remember hearing you screaming about
12  something about you raped my sister?
13  A.   Yeah.   I heard it.
14  Q.   Did you know what that was about when we started, when
15  we started the innocence proffer?
16  A.   No.
17  Q.   And during the course of the innocence proffer, what
18  did you come to understand about -- do you know --
19  withdrawn.
20    Do you know, in fact, whether or not the person,
21  anybody in that apartment ever raped your sister?
22  A.   No.
23  Q.   That night, did you think there was a person in the
24  apartment that looked like the person that might have raped
25  your sister?

244

Saxon - Redirect (Attias)

1  A.   Yes.
2  Q.   Do you have any idea how many shots were actually fired
3  in that apartment that night?   From your own memory.
4  A.   From my own -- one.
5    MS. ATTIAS:   I have nothing else, Judge.   Thank
6  you.
7    MR. GERBER:   Just a few questions, your Honor.
8    THE COURT:   Very well.
9  RECROSS EXAMINATION
10  Q.   When you previously met with the government, you spoke
11  about seeing a man in that apartment who you believed had
12  raped your sister; correct?
13  A.   Yes.
14  Q.   And, in fact, you identified him for the government;
15  correct?
16  A.   Yeah.
17  Q.   You gave his street name --
18  A.   Yeah.
19  Q.   -- right?
20  A.   Yes.
21  Q.   And you told the government that you had seen him in
22  that apartment that night; right?
23  A.   Yes.
24    MR. GERBER:   Thank you.   No further questions,
25  your Honor.

237

Saxon - Cross (Gerber)

1    THE WITNESS:  Oxycontin.
2    THE COURT:  Oxycontin.
3    THE WITNESS:  The other pills I had, I have the
4    actual paper, the prescription for.
5    THE COURT:  What are those, do you know?
6    THE WITNESS:  I don't know how to pronounce the
7    name.
8    THE COURT:  That's something you have a
9    prescription for?
10   THE WITNESS:  Yes.
11   THE COURT:  What's the prescription for.
12   THE WITNESS:  It was back pain, for pain.
13   THE COURT:  And you had hurt your back at some
14   point?
15   THE WITNESS:  Yeah.  I was in a car accident.
16   THE COURT:  So you had prescription pills for your
17   back, you had Oxycontin and you had Percocets.
18   THE WITNESS:  There's another one I had, too, I
19   forgot the name.
20   THE COURT:  So you had at least four different
21   types of pills?
22   THE WITNESS:  Yeah.
23   THE COURT:  How much were the Percocets?
24   How much did you sell those for?
25   THE WITNESS:  The Percs?  They different prices.

238

Saxon - Cross (Gerber)

1    Like the most, I mean, anywhere from like eight dollars
2    something like that.  Eight, ten.
3    THE COURT:  So eight to ten dollars for the
4    Percocets, and you had different types of Percocets?
5    THE WITNESS:  No, just one.
6    THE COURT:  Just one type.  But you would sell
7    them for eight to ten dollars.
8    And how much Percocets did you have that night; do
9    you recall?
10   THE WITNESS:  Four or five.
11   THE COURT:  Four or five.  What about the
12   Oxycontin, how much did you sell that for?
13   THE WITNESS:  Same thing.
14   THE COURT:  Eight to ten dollars?
15   THE WITNESS:  Yeah.
16   THE COURT:  How many of those did you have that
17   night; do you recall?
18   THE WITNESS:  I believe I had five, four or five,
19   the same thing.
20   THE COURT:  Okay.  Four or five of the Oxycontin.
21   What about the prescription pills you had, how much did you
22   sell those for?
23   THE WITNESS:  A dollar or two.
24   THE COURT:  A dollar or two.  Okay.  The fourth
25   kind, how many did you have of those; do you recall?

239

Saxon - Cross (Gerber)

1    THE WITNESS:  No.
2    THE COURT:  And the fourth kind of pill that you
3    had?
4    THE WITNESS:  I believe it was called, I don't
5    know how to pronounce it, like Federos(ph), Flexeril.
6    THE COURT:  Flexeril.  And how many of those did
7    you have approximately, if you can recall?
8    THE WITNESS:  I think ten.
9    THE COURT:  About ten; and how much do you sell
10   those for?
11   THE WITNESS:  Like two or three dollars.
12   THE COURT:  Okay.  And you said that when the cops
13   came in, that you were screaming.
14   THE WITNESS:  Yeah.
15   THE COURT:  What were you screaming?
16   THE WITNESS:  They had their foot on my neck.
17   They was doing all type of stuff to me.  I was screaming for
18   help.
19   THE COURT:  The men in the apartment had you
20   pinned down.
21   THE WITNESS:  Yeah.
22   THE COURT:  And you were screaming for help from
23   the cops.
24   THE WITNESS:  I was screaming period.
25   THE COURT:  You were screaming period.  When the

240

Saxon - Cross (Gerber)

1    cops came in, you continued to scream?
2    THE WITNESS:  Yeah.  I was screaming the whole
3    time.
4    THE COURT:  What did you tell the cops once they
5    were off of you?
6    What did you tell the police officers?
7    THE WITNESS:  I don't remember telling them
8    anything.  I just remember them grabbing me and taking me
9    out.
10   THE COURT:  You don't remember telling them you
11   were being mugged, that you were kidnapped, that you were
12   being assaulted?
13   THE WITNESS:  I didn't tell them till they asked
14   me later on.
15   THE COURT:  Did you tell them about the guy who
16   raped your sister?
17   THE WITNESS:  Not until they said something to me.
18   My lawyer asked me about it, and at that time I really
19   didn't remember until she asked me about it.  Because they
20   was like, what's that about?  And I had -- that's when I
21   started remembering other things.  At the time, when
22   situation is going on, I didn't remember nothing.
23   THE COURT:  Okay.  So, when you say, after your
24   lawyer talked about it, when was that after, how much longer
25   after the arrest, approximately?

233

Saxon - Cross (Gerber)

1 right?
2 A. Yes.
3 Q. He was watching for the police; right?
4 A. Yes.
5 Q. The guys in that apartment, they called 911; right?
6 A. Yeah.
7 Q. And when the police came to that apartment and they
8 found those men holding you down; right?
9 A. Yeah.
10 Q. You didn't say anything; did you?
11 A. I was screaming.
12 Q. You were screaming when the police came in?
13 A. I was screaming the whole time.
14 Q. So let's be clear. Your testimony is that, when the
15 police walked in there, you were screaming.
16 A. Yeah.
17 Q. Now you were here when Officer Artola testified; right?
18 A. Right.
19 Q. You remember him testifying that when he came in there,
20 the room was silent; right?
21 A. Yes.
22 Q. So your testimony is that he's a liar; right?
23 A. Yes.
24 MS. ATTIAS: Objection.
25 THE COURT: Sustained.

234

Saxon - Cross (Gerber)

1 BY MR. GERBER:
2 Q. Now your testimony is that you had two pairs of pants
3 on that night; right?
4 A. Yes.
5 Q. Okay. And what colors were those pants?
6 A. Brown and blue.
7 Q. What color pants are you wearing now?
8 A. Brown.
9 Q. And that -- your testimony is that's one of the pairs
10 that you were wearing; right?
11 A. Yes.
12 Q. And there was a second pair of blue pants; right?
13 A. Yes.
14 Q. And your claim is those are the pants that the
15 individuals in that apartment took from you, right?
16 A. The blue ones, yes.
17 Q. Okay. And you were wearing a gray, some sort of gray
18 jacket that night; is that right?
19 A. Yes.
20 Q. And your claim is that the people in that apartment
21 took that from you too; right?
22 A. Yeah.
23 Q. Right. Now, the people in that apartment took that
24 gray coat from you and those blue pants so the police
25 wouldn't have them; right?

235

Saxon - Cross (Gerber)

1 MS. ATTIAS: Objection.
2 THE COURT: Overruled.
3 A. I don't know why they took it. They took it because
4 they was taking my clothes.
5 Q. The people in that apartment. The men you say attacked
6 you, they took those clothing items, right?
7 A. Yeah.
8 Q. They took them from you.
9 A. Yeah.
10 Q. And your girlfriend picked up your property from the
11 police; correct?
12 A. Yes.
13 Q. And, in fact, she picked up from the police a pair of
14 bluejeans; right?
15 A. Yes.
16 Q. And she got a gray, zip-up coat; right?
17 A. I believe so, yes.
18 Q. From the police.
19 A. I believe so.
20 Q. Now your testimony these men also took your hat; is
21 that right?
22 A. I don't have it. I don't know where it's at, so I
23 believe so, yeah.
24 Q. Well, your testimony before was they took your hat from
25 you; right?

236

Saxon - Cross (Gerber)

1 A. Yeah.
2 Q. Well, do you believe that to be the case or do you
3 remember that to be the case?
4 A. They took my hat.
5 Q. You remember them taking your hat.
6 A. They took it.
7 Q. They took one of your pairs of pants; right?
8 A. Yeah.
9 Q. You were wearing shoes; right?
10 A. Boots.
11 Q. Boots. They didn't take off your boots; did they?
12 A. No.
13 Q. So they took your pants off but they kept the boots on.
14 A. Yeah.
15 MR. GERBER: No further questions, your Honor.
16 THE COURT: Mr. Saxon, you said you had like 30
17 pills?
18 THE WITNESS: Yes.
19 THE COURT: What were they?
20 THE WITNESS: I had some -- I had Percs.
21 THE COURT: Percocets?
22 THE WITNESS: Yes. Oxy, and I had some
23 prescription. Some other ones.
24 THE COURT: I'm sorry, what's Oxy? Oxycodone? If
25 you know.

229

Saxon - Cross (Gerber)

1  Q.  It just closed; right?
2  A.  It closed.  Yeah.
3  Q.  Okay.  And then your back was to the door; right?
4  A.  Yes.
5  Q.  So let me be clear.  Your back is to the front door and
6  there are four or five guys rushing you; right?
7  A.  Yeah.
8  Q.  Okay.  And, again, you're drunk at this time; right?
9  A.  Yes.
10 Q.  And your claim is that there were additionally people
11 who were watching what was going on; right?
12 A.  Yes.
13 Q.  They were watching from the kitchen?
14 A.  Yes.
15 Q.  And they were kneeling down?
16 A.  Yes.
17 Q.  Or they were crouching down?
18 A.  Both.
19 Q.  They were sort of, it was sort of a ducking motion;
20 right?
21 A.  Yes.
22 Q.  And now your claim is that one of these people placed a
23 gun in your face; right?
24 A.  Yes.
25 Q.  Okay.  And he placed it very close to you; right?

230

Saxon - Cross (Gerber)

1  A.  Yeah.
2  Q.  And then you grabbed the gun; right?
3  A.  Yes.
4  Q.  With both of your hands.
5  A.  Well, yeah.
6  Q.  All right.  So you have two hands on the gun.
7  A.  Yeah.
8  Q.  Now so you have two hands on the gun, one guy is
9  holding this gun right in front of you, there were three or
10 four other guys who are attacking you; right?
11 A.  Yeah.
12 Q.  They were grabbing at your arms; right?
13 A.  My waist and stuff.  My waist.
14 Q.  They were grabbing at your waist, that's your
15 testimony.
16 A.  Yeah.
17 Q.  But not your arms.
18 A.  He they was grabbing at my waist and they was going in
19 my pockets.
20 Q.  You had two free arms to grab the gun, that's your
21 testimony; right?
22 A.  Yes.
23 Q.  You had two free hands to grab that gun?
24 A.  Yes.
25 Q.  No one is restraining your arms.

231

Saxon - Cross (Gerber)

1  A.  No.
2  Q.  And you remember one gun; correct?
3  A.  Yeah.
4  Q.  Was there a second gun that you remember?
5  A.  I only remember one gun.
6  Q.  One gun.  You remember one gunshot; right?
7  A.  Yes.
8  Q.  Now, these individuals on your story ultimately they
9  pinned you down; right?
10 A.  Yes.
11 Q.  They had you on the ground?
12 A.  Yes.
13 Q.  And according to you, they had a gun, right?
14 A.  Yes.
15 Q.  At this point when they're holding you down, you can't
16 move; right?
17 A.  No.
18 Q.  And you were actually yelling for them to let you go;
19 right?
20 A.  Yes.
21 Q.  Okay.  And then they called 911; right?
22 A.  Yes.
23 Q.  And when you were being held down, you saw the man who
24 you believe raped your sister; correct?
25 A.  Yes.

232

Saxon - Cross (Gerber)

1  Q.  You saw him there in that apartment; correct?
2  A.  Yes.
3  Q.  Now you testified, there was testimony regarding these,
4  these videotapes; how long have you had these tapes for?
5  A.  Since I believe August.
6  Q.  And you've watched them many times; right?
7  A.  Yes.
8  Q.  Many times; correct?
9  A.  Yes.
10 Q.  All right.  And at one point you testified that it took
11 you a while to figure this out; right?
12 A.  Yeah.
13 Q.  Now, you also talked about an individual who you
14 described as a lookout; correct?
15 A.  Yes.
16 Q.  And to be clear, on your account he was a lookout while
17 you were inside the apartment; right?
18 A.  Yeah.
19 Q.  So you never actually saw this person operating as a
20 lookout; correct?
21 A.  Other than the camera.
22 Q.  Not the camera.  What you saw that night.  You didn't
23 see anyone operating as a lookout; correct?
24 A.  No.
25 Q.  And your claim is that he was a lookout for the police;

225

Saxon - Cross (Gerber)

1 arrest for the instant offense; isn't that true?
2 A. No, I didn't.
3 Q. You didn't tell him that?
4 A. No, I didn't.
5 Q. Now you testified that you were, you were drunk. You
6 actually don't remember that much from that night; do you?
7 A. No.
8 Q. No you do remember lots of things or no you don't
9 remember lots of things?
10 A. I remember things.
11 Q. So your memory is not hazy?
12 A. No.
13 Q. Memory is clear?
14 A. Yes.
15 Q. Now in August of last year, you met with the
16 government; correct?
17 A. Yes.
18 Q. And your lawyer was there; right?
19 A. Yes.
20 Q. And you spoke with individuals from the government;
21 correct?
22 A. Yes.
23 Q. It was in this building; right?
24 A. Yes.
25 Q. And there was someone there taking notes; right?

226

Saxon - Cross (Gerber)

1 A. Yes.
2 Q. And people were paying attention to what you were
3 saying; right?
4 A. Yes.
5 Q. And, at that time, didn't you say that you didn't
6 remember much from that night?
7 A. Yes.
8 Q. You did say that.
9 A. Yeah. At that time. Yeah.
10 Q. Okay. So at that time, meeting with the government,
11 you said you did not remember much from that night.
12 A. Yeah.
13 Q. And you were telling the truth; right?
14 A. Yes.
15 Q. So you were telling the truth and you said you do not
16 remember much from that night, but now you're saying that
17 you do remember what happened that night.
18 A. Yes.
19 Q. So, your memory has improved?
20 A. After reviewing all the discovery. Yeah.
21 Q. Right. Exactly.
22         MS. ATTIAS:  Objection, Judge.
23         THE COURT:  Sustained.
24 BY MR. GERBER:
25 Q. Now you say that on that night you met up with a woman

227

Saxon - Cross (Gerber)

1 on the street; correct?
2 A. Yes.
3 Q. And you told her that you had pills; right?
4 A. Yes.
5 Q. And you told her how many pills you had; right?
6 A. Yes.
7 Q. And, again, you told her you had about $50 worth of
8 pills; right?
9 A. I didn't say $50. I told her I had pills. I told her
10 I had like 30 pills on me.
11 Q. And those pills are worth around $50.
12 A. Yes.
13 Q. And your testimony is that she said to you that she was
14 going to take you indoors somewhere; right?
15 A. Yes.
16 Q. Somewhere where you could sell the pills; right?
17 A. Yes.
18 Q. And your testimony is that you went to different houses
19 knocking on the door; correct?
20 A. Yes.
21 Q. And you just followed her?
22 A. Yes.
23 Q. From house to house?
24 A. Yeah.
25 Q. And at one point she said that she was looking for

228

Saxon - Cross (Gerber)

1 Victor and Jose; right?
2 A. Yeah.
3 Q. But she didn't know where they lived; right?
4 A. I guess. Yeah. She said she was looking for them.
5 Q. And she was knocking on various doors to try to find
6 them?
7 A. Yeah.
8 Q. And then you go to 221 North Street; right?
9 A. Yes.
10 Q. And you had never been to that apartment before;
11 correct?
12 A. Yes.
13 Q. Yes, you had not been to the apartment before.
14 A. Yeah. I never been there.
15 Q. Okay. And you do not, you did not know the people in
16 that apartment; right?
17 A. Right.
18 Q. Okay. And then, and then you say when you came into
19 the apartment four or five guys rushed you; right?
20 A. Yes.
21 Q. Now, at this time, the door, you came in through the
22 front door; right?
23 A. Yeah.
24 Q. And that door was closed behind you; right?
25 A. Yes.

## 221

Saxon - Cross (Gerber)

1  Q.  That's your real birth date?
2  A.  Yes.
3  Q.  But sometimes you use a different name; right?
4  A.  Yes.
5  Q.  And you've been arrested before; right?
6  A.  Yes.
7  Q.  And there have been times when you've been arrested and
8  you've given the police a different name; right?
9  A.  Yes.
10 Q.  You used the name Donelle Green; right?
11 A.  Yes.
12 Q.  And sometimes you've used other birth dates; right?
13 A.  Yes.
14 Q.  And you used different birth dates when you were
15 arrested by the police; right?
16 A.  Yes.
17 Q.  So you were lying to the police; right?
18 A.  Yes.
19 Q.  And you lied because you were trying to get out of
20 trouble; right?
21 A.  No.
22 Q.  You weren't trying to get out of trouble?
23 A.  No.  When I told them my name was Donelle Green, I was
24 being sarcastic.
25 Q.  You were being sarcastic?

## 222

Saxon - Cross (Gerber)

1  A.  Yeah.  Because when I told them my name is Donelle
2  Green, I was being sarcastic.  I told them 7/7/77 Donelle
3  Green.
4  Q.  So you were joking.
5  A.  I was being sarcastic with them.
6  Q.  When you were arrested.
7  A.  Yeah.
8  Q.  Now, the night we've been talking about, you were out
9  on the street dealing drugs; right?
10 A.  Yes.
11 Q.  And you had pills on you; right?
12 A.  Yes.
13 Q.  Those were pills for sale; right?
14 A.  Yes.
15 Q.  And you had about 30 pills; correct?
16 A.  Yes.
17 Q.  And you went to 120 Wickham Avenue in Middletown to
18 sell those pills; right?
19 A.  Yes.
20 Q.  And about how much are those pills worth?
21 A.  Different prices.  Different prices.  They vary.
22 Q.  You had 30 pills; right?
23 A.  Yeah.
24 Q.  You know what kind of pills you had?
25 A.  Yes.

## 223

Saxon - Cross (Gerber)

1  Q.  So, ballpark, how much were those pills worth?
2  A.  Maybe $50.
3  Q.  Fifty dollars?
4  A.  Yeah.
5  Q.  Five zero.
6  A.  Yeah.
7  Q.  Now, you were drinking that night; right?
8  A.  Yes.
9  Q.  And you had a lot to drink; correct?
10 A.  Yes.
11 Q.  You were drunk?
12 A.  Yes.
13 Q.  And you had also taken, you had taken pills that day;
14 right?
15 A.  No.
16 Q.  You didn't take pills that day?
17 A.  No.
18 Q.  You're sure?
19 A.  Yeah.
20 Q.  Now, you were interviewed in connection with this case
21 by a probation officer; right.
22 A.  Yes.
23 Q.  And you told him --
24     MS. ATTIAS:  Objection.
25     (Counsel confer)

## 224

Saxon - Cross (Gerber)

1      MS. ATTIAS:  Judge, I would object to any
2  questions that are based on the draft of the presentencing
3  report.
4      MR. GERBER:  Your Honor, we're not offering any
5  document at this time into evidence or anything like that,
6  we do have a presentence report, and based on that I think I
7  can, I think we can ask the defendant questions and he can
8  answer truthfully.
9      MS. ATTIAS:  It is a draft and there are issues
10 with the draft that have not yet been resolved and things
11 that I have -- there's a host of issues with the draft.
12     THE COURT:  Well, it appears as though the
13 government may have a good faith basis to ask, so the
14 government can ask and he can testify to the best of his
15 recollection.
16 BY MR. GERBER:
17 Q.  You spoke with a probation officer, correct?
18 A.  Yes.
19 Q.  And you told him that prior to your arrest in this case
20 you were using, you were taking pills, correct?
21 A.  I have taken.  Yeah.
22 Q.  Vicodin and Percocet; right?
23 A.  Yeah.
24 Q.  And, in fact, you told him that you continued to use
25 these medications and last used them on the date of your

### Saxon - Direct (Attias)

1  corner?

2  A.  Yes.

3          MS. ATTIAS:  Stop, please.

4  Q.  Do you know the person in the very bottom of the

5  screen?

6  A.  No.

7          MS. ATTIAS:  Okay.  Keep going.  And now I'm going

8  to ask you to move to 12:24.

9  BY MS. ATTIAS:

10  Q.  As this is fast forwarding, Mr. Saxon.  That's the man

11  who was inside the apartment; right?

12  A.  Yeah.

13  Q.  Was he one of the ones who had jumped on you?

14  A.  Nah, he was the one, I believe he was the one that was

15  crouched down.

16  Q.  That was what?

17  A.  At one point when I came in, there was two people, one

18  was crouched down and one was on the floor watching.

19          MS. ATTIAS:  Okay.  Please play it from here.

20  Thank you.

21  Q.  And are we able to see that -- that man that just went

22  around that building, what is that?

23  A.  That's him.

24  Q.  The same guy.

25  A.  Yes.

### Saxon - Direct (Attias)

1          THE COURT:  Are we looking at the same corner now

2  as we were on the previous camera?

3          THE WITNESS:  Yeah.  They just, it went, before it

4  was zeroed in.  Now it backed up.  But it's the same corner.

5          THE COURT:  Is that the entrance to 221 North?

6          THE WITNESS:  No.  That's not the other side of

7  the whole building.

8          THE COURT:  So we're not looking at 221 North in

9  that picture.

10          THE WITNESS:  We can't see it in the Prospect, no.

11          MS. ATTIAS:  Can you stop it for a moment, please?

12  BY MS. ATTIAS:

13  Q.  In this picture, where would 221 North Street be?

14  A.  Up in that street here.

15  Q.  Use the words "left" and "right" and "up" and "down."

16  A.  It's like diagonal and up.

17  Q.  So, from where this building is in the picture?

18  A.  It's around where the kid ran around.

19  Q.  So it would be past it into the black, the dark area of

20  the photo?

21  A.  Yeah.

22  Q.  So this is around the corner from the 221 North.

23  A.  Right around the corner.

24          MS. ATTIAS:  And play it, please.

25  Q.  And those two people --

### Saxon - Direct (Attias)

1          MS. ATTIAS:  Yes, right there.  If you could stop.

2  Q.  Who are those people, if you know?

3  A.  The guy with the dark color was one of the guys that

4  was in the apartment and that's the same kid who's been

5  looking out the whole time with the yellow.

6  Q.  And the guy in the dark --

7          MR. GERBER:  Objection, your Honor.  Objection.  I

8  think his testimony is it's not from personal knowledge.

9  Talking about this person who was looking out.  By the

10  defendant's own admission, he was inside 221 North Street.

11          THE COURT:  He did, I believe, testify that the

12  guy with the yellow shirt was in the apartment at one point.

13  BY MS. ATTIAS:

14  Q.  And the men in the darker clothing, what was he doing

15  in the apartment?

16  A.  He was, he was one of the guys that I seen when I was

17  in there and I believe that, I don't know if he was one of

18  them that grabbed me or whatever, but he was in the

19  apartment when all that stuff was going on.  He was one of

20  them.

21  Q.  Torrell, on the night that you were arrested, were you

22  selling pills?

23  A.  Yes.

24  Q.  Did you have a gun?

25  A.  No.

### Saxon - Direct (Attias)

1  Q.  Did someone in the apartment fire a shot?

2  A.  Yes.

3  Q.  When you entered that apartment, what was -- what were

4  you looking to do?

5  A.  Just sell the pills.  I was looking for a spot so I

6  could be comfortable.

7  Q.  Did you ever shoot a gun at any of these men in that

8  apartment?

9  A.  No.  No.

10  Q.  Did you have a gun that night?

11  A.  No.

12          MS. ATTIAS:  I have nothing else, Judge.  Thank

13  you.

14          THE COURT:  Okay.

15          Cross examination

16          MR. GERBER:  Yes, your Honor.

17  CROSS EXAMINATION

18  BY MR. GERBER:

19  Q.  Mr. Saxon, let's start with your name.  What is your

20  real name?

21  A.  Torrell Saxon.

22  Q.  That's the your legal name, right?

23  A.  Torrell Monroe Saxon.  Yeah.

24  Q.  And you were born on June 22, 1978; right?

25  A.  Yes.

Saxon - Direct (Attias)

1      MR. GERBER:   Objection, your Honor.

2      THE COURT:   Yes.  There's no question.

3      MS. ATTIAS:   Can we stop?  Okay.  Roll it from

4  here, and stop it here, please.

5  BY MS. ATTIAS:

6  Q.  What can you see in this picture, if anything?

7  A.  The girl is walking and he just saw her.

8  Q.  You can't say if somebody else saw something, but do

9  you see the man from the house who was on the corner?

10  A.  One of the guys, yeah, he's right here.  He's getting

11  ready to come down the ramp.

12  Q.  Can you move to the left of those blue arrows?

13  A.  Yeah.  The arrows is where he was at.  He's up now on

14  the ramp getting ready to come down.  He's looking right

15  out.

16  Q.  And where is she?

17  A.  She's coming right down.  You could see her pants and

18  something white in her hand.

19      THE COURT:   Where on the screen do you see her?

20      THE WITNESS:   Right under this light.  Right under

21  that pole right there coming on the right-hand side.  On the

22  same side --

23  BY MS. ATTIAS:

24  Q.  If we play like another two seconds or so, we're going

25  to see her?

---

Saxon - Direct (Attias)

1  A.  She's going to come right there.  Yeah.

2  Q.  And please stop me when you see her coming into the

3  screen.

4      Who is that crossing the street now with the white --

5  A.  The lookout.  Oh, with the white?  I don't know who

6  that is.  This is the girl coming right now.  She's right by

7  the store.

8  Q.  Right here in this picture?

9  A.  Walking towards the store right now.

10      THE COURT:   Coming from the left towards the

11  right?

12      THE WITNESS:   No, she's right here.

13      MS. ATTIAS:   Stop, please.

14      THE WITNESS:   That's her right there right in

15  front of the ramp.

16  BY MS. ATTIAS:

17  Q.  Is that her approaching the steps --

18  A.  Yeah.  That's her right there.

19  Q.  Okay.  So just before this, Torrell, what did we see

20  the man in the yellow shirt.

21  A.  The man in the yellow shirt watched -- she came back

22  out of the house, and when she was walking towards the

23  store, he looked at her and seen that she was coming, he's

24  running back --

25      THE COURT:   I'm sorry, were you there?

---

Saxon - Direct (Attias)

1      THE WITNESS:   Huh?

2      THE COURT:   Were you there when this happened?

3      THE WITNESS:   I was inside the thing.  It took me

4  a while to figure this out like what was going on.  This

5  girl set me up.  This girl --

6      THE COURT:   Okay.  You need to stop.  Stop

7  answering.  Were you there?

8      What this screen is depicting right now at

9  12:17:02 a.m. on the March 25th, where were you at that

10  time?

11      THE WITNESS:   I was inside the house.

12      THE COURT:   Inside the house, 221 North?

13      THE WITNESS:   The situation was going on.  Yeah.

14      THE COURT:   Okay.  So --

15  BY MS. ATTIAS:

16  Q.  So, Torrell, you can't tell the Judge what you think

17  these people in these pictures were doing.  I am simply

18  asking you to point out what you're seeing not anything

19  else.

20  A.  All right.

21  Q.  Okay?

22  A.  They're walking back to the store.

23  Q.  You can't talk unless I ask you a question.  All right?

24      MS. ATTIAS:   Could we please move to 12:20?  .

25      Allison, can you stop?

---

Saxon - Direct (Attias)

1  BY MS. ATTIAS:

2  Q.  Torrell, there was a grouping of people who just moved

3  across the street; were those any of the people in the

4  apartment?

5  A.  No.

6  Q.  Okay.  So now we're at 12:19:27.

7      MS. ATTIAS:   Can you play it from here, please?

8  Q.  Okay.  In this shot, can you see the people or the

9  girl?

10  A.  That's the wrong camera.  No, I can't see them.  You've

11  got to go back to camera eight.

12  Q.  Okay.  And from here on in, are we just going to be

13  looking at camera eight?

14  A.  I believe so.

15  Q.  Okay.

16      MS. ATTIAS:   Allison, you can stop right here?

17  Okay.  And can you play -- yes.  Great.

18  BY MS. ATTIAS:

19  Q.  This person, the yellow shirt that's walking up off the

20  screen now, is he the same guy who came out of the apartment

21  before?

22  A.  Yeah.

23  Q.  Okay.

24      MS. ATTIAS:   Keep going, please.

25  Q.  And that's him now walking back, standing near the

Saxon - Direct (Attias)

1  Q.   And what is this, Mr. Saxon?
2  A.   It's still him standing on the side of the street
3  looking out.
4        MS. ATTIAS:   Can we please go ahead to 12:14, make
5  it about 12:13:45, if you can?
6        THE COURT:   Can't this be fast forwarded?
7        MS. ATTIAS:   That's a good place to start normally
8  from. Thanks.  Play it from here.
9  A.   This is the girl at the -- I went in the house, she
10 skipped out, she was skipping across the street out the back
11 way.
12 Q.   Okay.  Did we just pass that?
13 A.   You've got to rewind it.  I can barely -- she's right
14 here on the corner under the stop sign, but you've got to
15 rewind it a little bit.
16 Q.   Okay.  I see someone --
17 A.   No, you've got to rewind it.  She skipped across so
18 fast.  Rewind it a little more.
19        THE COURT:   I saw someone coming from the right
20 side; is that correct?
21        THE WITNESS:   She walked across the street and ran
22 out the back.  She's right here.  That's her right there.
23 If you stop it, it's like her figure right there.  That's
24 her.
25        THE COURT:   She moving from the left towards the

Saxon - Direct (Attias)

1  right.
2        THE WITNESS:   She's going like this and she's
3  cutting back going back towards the store right now.  She
4  just ran out what was the front.  The front of the house.
5  BY MS. ATTIAS:
6  Q.   And we're at 12:14:58.  So, how do you see that it's
7  her, Torrell?  Can you describe what she's wearing?
8  A.   She had the dark hoody, the blue jeans and the white,
9  and when she comes around, you follow this with the camera
10 you gonna see her.
11        MS. ATTIAS:   Okay.  Could we play it, please?
12        Actually, we can fast forward?
13 BY MS. ATTIAS:
14 Q.   Mr. Saxon, is there anything in this picture that's
15 relevant --
16 A.   That was just her coming -- skip -- that was just her
17 running out the back skipping across the street.
18        THE COURT:   That's her on the right, correct?
19        And there appears to be an individual on the left
20 wearing a white hat; correct?
21        THE WITNESS:   I don't know who that is.
22        THE COURT:   Okay.
23 BY MS. ATTIAS:
24 Q.   And is she in this picture?
25 A.   That's here right there on the corner.  It look like a

Saxon - Direct (Attias)

1  phone is in her hand, you see her sneakers right there.
2  Q.   And we're at 12:15:10.
3        MS. ATTIAS:   And could we keep playing this?
4  A.   You've got to go to the next camera so you could see
5  what happens.
6  Q.   Yes.  We have to do question and answer.
7        MS. ATTIAS:   Actually, Allison, could you please
8  forward to 12:16:15, and play it from there, please?
9  Q.   Mr. Saxon, did I just miss something?
10 A.   I'm trying to tell you, you've got to go to the other
11 camera she's --
12 Q.   But on this camera?
13 A.   There's nothing else right here at this time.  This
14 time that you're looking for is supposed to be on camera
15 ten.
16 Q.   Okay.  Okay.  I'll get back to camera ten.
17        MS. ATTIAS:   Could we please forward to 12:18?
18 And we can just play it from there.
19        And can we stop there for a moment?
20 Q.   Is there something in this picture?
21        What are we looking at here?
22 A.   Wrong camera.  There's nothing here.
23        THE COURT:   So, Mr. Saxon, based on your view of
24 this particular camera, is there anything else of substance
25 that's going to take place on this camera?

Saxon - Direct (Attias)

1        THE WITNESS:   As of right now, not right now.  Not
2  at this time.  It's the other camera.
3  BY MS. ATTIAS:
4  Q.   Okay.  So, I want to move ahead on this camera.  Do you
5  see, at 12:18:39, do you see any of the people from the
6  house inside the apartment?
7  A.   There's no one there.  Press "play," there's no one
8  there right now.
9        MS. ATTIAS:   Could we please switch back to camera
10 ten and go to 12:16?
11        THE COURT:   Mr. Saxon, is this the camera that you
12 wanted to see?
13        THE WITNESS:   Yes.
14        THE COURT:   And how far is this location from the
15 corner we were just looking at?
16        THE WITNESS:   It's like about maybe 20 feet,
17 something like -- it's like right across the street from it.
18 You could stop it, cause I just seen it.
19        MS. ATTIAS:   So can we play it from here?
20        THE WITNESS:   It's like a few feet.
21        THE COURT:   Okay.
22        THE WITNESS:   Right here, if you look on the
23 corner, the guy in the yellow, this is the guy who was
24 watching the whole scene, who's looking out.  When this girl
25 is coming down --

Saxon - Direct (Attias)

1 going on. The whole time he's watching, he's looking out
2 for police.
3           THE COURT:   Okay.
4 Q.   So now let's try to do question and answer from here.
5 Okay?  So, 12:09.
6           MS. ATTIAS:   If we could play that, please.  We're
7 at 12:09:14.
8 A.   No, I can't see it like that.  That's him.  You can't
9 even see him.  That was him that was just in the corner.  If
10 you rewind a little bit, you'll see.  He should have a
11 yellow shirt on.
12 Q.   Can you see in this picture what you were looking for?
13 A.   I don't see anything here.
14           MS. ATTIAS:   Can we get back to just about 12:09
15 and 15 seconds or so?
16 A.   That was --
17 Q.   Great.
18           MS. ATTIAS:   Can we play it from here, please?
19 Q.   And just say "stop" when it's time to stop it, Torrell.
20 A.   It happens quick.  You're going to have to rewind it
21 because he already went by.
22 Q.   It's just --
23 A.   There we go right there.  This kid right here.
24           I think they're rewinding it too much.
25 Q.   Okay.

Saxon - Direct (Attias)

1 A.   Right there.  This kid right there.
2 Q.   Who are you saying that is?
3 A.   This is the guy.  If you watch this, he's the lookout.
4 They said in the report that there was somebody outside
5 waiting for the police for the whole time.  He was not
6 waiting.  He was looking out for them.  And I'm going to
7 show you because him and the girl, when the girl comes,
8 you're going to see a part when she go to it, like he's
9 there the whole time watching the whole scene, and the girl,
10 the girl comes and she's coming from this back way, you're
11 going to see her slipping out the back and she's going to
12 come across the street.  When he's at the store, as soon as
13 he looks and sees her, he's running right back to this area.
14 The guys who's in the house, they going to give each other
15 handshakes and you're going to see the whole thing.  Right
16 now, this guy, he's going to be standing right -- to be in
17 this area for a few minutes.
18           MS. ATTIAS:   Can we please skip to 12:11?
19 A.   As a matter of fact, right here is when he actually --
20 right here is like when we went to the front of the house,
21 he's running to the back.  He's running, like what I
22 considered was the front is actually the back, and in this
23 street right here is called Prospect.  This is where the
24 police come in there, and this is where this guy, he keeps
25 running up and down and he goes to the back or the front

Saxon - Direct (Attias)

1 when I go up to the other area.
2           MR. GERBER:   Your Honor, we would object.  I don't
3 think there's actually a question pending at the moment.
4 The government would object to sort of this free-standing
5 monologue.
6           THE COURT:   Yes.  Why don't you take control,
7 Ms. Attias?
8           MS. ATTIAS:   Very well, Judge.  I'll try.
9           Could we please forward to 12:11?
10 BY MS. ATTIAS:
11 Q.   And one question, Torrell, looking at this picture,
12 where actually is the house?
13 A.   It's about 5 feet from there.  Like five, five.
14 Q.   Which direction?
15 A.   Where he just ran up in that street.
16 Q.   Okay.
17           THE COURT:   To the left.
18           THE WITNESS:   Yeah.
19           MS. ATTIAS:   And play from there, please, when you
20 can.
21           Judge, as these next few minutes are playing, I am
22 going to ask if we can give Mr. Saxon a direction to just
23 don't explain everything, just tell us what we're seeing as
24 we're seeing it.
25           THE WITNESS:   All right.

Saxon - Direct (Attias)

1           MR. GERBER:   Your Honor.
2           THE COURT:   Yes.
3           MR. GERBER:   The government would ask, if defense
4 counsel has questions --
5           MS. ATTIAS:   Stop, please.
6           MR. GERBER:   If defense counsel has questions she
7 wishes to put to the defendant, that's one thing, but this
8 sort of open-ended, please just describe what you're seeing,
9 it's just an invitation for the defendant to talk, it's not
10 actually a question.
11           THE COURT:   I mean, Ms. Attias, I take it you've
12 seen this video.
13           MS. ATTIAS:   Yes.
14           THE COURT:   And you know where you're going.
15           MS. ATTIAS:   I'm attempting to --
16           THE COURT:   Why don't you take us to where you're
17 going and then ask a question about that.  Let's do it that
18 way.
19 BY MS. ATTIAS:
20 Q.   12:11:54; what are we looking at, Torrell?
21 A.   That's the guy I just showed you that ran up the block,
22 he's going to stand right there.
23 Q.   Okay.
24           MS. ATTIAS:   Can you play, please, and stop at
25 about 12:12:06?

Saxon - Direct (Attias)

1       (Counsel confer)
2           MS. ATTIAS:   Okay.  Can you please run that at
3    11:53?
4    A.   That's me crossing the street again.
5    Q.   At the bottom of the screen?
6    A.   Yeah.
7    Q.   And, as you see what's happening here, you can tell us
8    what we're seeing.
9    A.   I was going back in the store, and she was going to
10   come behind me.  The whole time we was just back and forth
11   the whole time.  When she said she was in the apartment, she
12   was out there on the street with me.
13   Q.   What store is this that you're going in and out of?
14   A.   That's the store on North Street.  I was drunk, so I
15   remember walking down, but it was right there.  That's the
16   store, it's right on North Street, on the corner of North
17   Street and Wickham.  The laundromat is like a little bit
18   behind it.
19           THE COURT:   Is that Sam's?
20           THE WITNESS:   No, that's not Sam's.  Sam's is on
21   the other side.
22   BY MS. ATTIAS:
23   Q.   And what does this store sell?
24   A.   This store?  That's the closest deli store.  That's
25   where he could have said that he went to buy a card, but you

Saxon - Direct (Attias)

1    never see him walking in that store at all.  When he walk
2    out his house, that's the only store that's open.  There's
3    another store across the street, but it closes at
4    10:00 o'clock.  I think that was the girl just going back in
5    there.
6    Q.   Okay.  And we can --
7    A.   I turned my head for a second.  I was just showing she
8    was with me that whole time.  She was never in the house at
9    time they said she was there.
10           MS. ATTIAS:   Just play for a few more seconds,
11   please, Ms. Tull.  Okay.  Yes, that's good.  And could we
12   forward please to 12:00 o'clock midnight?
13   A.   That's the girl leaving now.  She just walked across
14   the street.
15           THE COURT:   I'm sorry, did she just come out of
16   that store; is that what you said?
17           THE WITNESS:   No, she came out before me.  She
18   walked across the street.  It happened so fast.  She went
19   right across the street.
20           THE COURT:   But she just came out of that store
21   you said, right?
22           THE WITNESS:   Yeah.  She came out before me.
23           THE COURT:   Okay.
24           THE WITNESS:   Now she's going back to the store.
25   She just went back in.

Saxon - Direct (Attias)

1           MS. ATTIAS:   Okay.  If you could slow it down here
2    and play it for just about a minute?
3           THE WITNESS:   That's the girl coming out, and I'm
4    coming out right behind her.
5    BY MS. ATTIAS:
6    Q.   Is that you coming out now, Torrell?
7    A.   Yeah.  She cross -- she's right there in the street.
8           MS. ATTIAS:   And can you stop that for a second,
9    please?
10   Q.   What's happening here?
11   A.   If you play a little more, I'm going to be coming back
12   and you see me with the Arizona bottle in my hand.  The
13   girl, she's walking across the street first.  She's right
14   now crossing the street.
15   Q.   You want to go back a couple of seconds you said?
16   A.   No, just keep going.  I'm about to cross the street
17   right now.  You can see that I have -- it should be clearer
18   right here.  I have on gray.  Right there in the light you
19   could see --
20   Q.   You're on the yellow line?
21   A.   You see I got gray, two-tone gray.  I got the Arizona
22   bottle in my hand and we're walking.  Now we walking towards
23   the house.  We about to walk towards the house.
24   Q.   Which hand is the bottle in?
25   A.   It looks like my left hand.

Saxon - Direct (Attias)

1    Q.   Okay.
2           MS. ATTIAS:   Can we please go to 12:16?
3           You know what, I'm sorry, can we switch to camera
4    eight and start at 12:09?
5    A.   I know the part it's -- they're going to have to make
6    the screen wider so you can actually see the kid running
7    behind that, running up there.
8    Q.   Okay.  Torrell, while we're finding the starting spot,
9    where are we looking at?
10   A.   This is where -- this is the street where the incident
11   came in where the police came in from.  To me, where I came
12   in from was supposed to have been the front, but from what I
13   been hearing, reading, the front is the side, which looks
14   like the side but it's the front.  And that's where the
15   police came in.  This is the same area where this kid that's
16   on the side of the street, they said he was out there
17   waiting for the police.  He was out there as a lookout.
18   You're going to see how he runs up there, up and down.  When
19   he goes to the back, I'm going to the front.  Soon as I go
20   to the front, he runs to the back as a lookout, then he
21   comes back and stands on the corner this entire time.  When
22   the girl comes, he's going to run to the store, when the
23   girl gets to store, he's going to run back over there.  As
24   soon as he sees the girl, he looks out, he runs across the
25   street and goes right back in this area to watch the scene

Saxon - Direct (Attias)

1  the girl.

2  Q.   This is going to be a big jump to 11:53.

3          THE COURT:   We can't see this any --

4          MS. ATTIAS:   Judge -- can we --

5  A.   Going too far back.

6  Q.   While we're doing this, Torrell, how many times have

7  you watched these videotapes?

8  A.   Every day.

9  Q.   At the jail?

10  A.   Yeah.

11  Q.   And what do you see on the screen now?

12  A.   That's me and the girl.

13  Q.   And which side are you on?

14  A.   I'm the one with the hat on. I'm the one on the right

15  side.

16  Q.   And are those the same boots that you're wearing now?

17  A.   Yeah.

18          MS. ATTIAS:   Could we please jump to 11:53?

19          THE COURT:   Before you move on, I just want --

20  Mr. Saxon, what colors that you testify that both you and

21  the young woman were wearing?

22          THE WITNESS:   I have on the gray jacket. The

23  black hat, my blue jeans and these boots that I have on.

24  The girl has on a dark-blue hoody, hoody sweater

25  and she has like acid-wash jeans and white sneakers.

---

Saxon - Direct (Attias)

1          THE COURT:   Okay. I just want the record to be

2  clear that, based on what I'm seeing, I don't doubt your

3  testimony, that the jacket you appear to be wearing, at

4  least to my eyes, looks brownish and the pants look black.

5  I can't otherwise tell what color they are. The hat does

6  appear to be dark colored. And the girl does appear to be

7  wearing a dark colored sweatshirt and does appear to be

8  wearing jeans.

9          THE WITNESS:   The boots that I have on, if you

10  see, the gray part, it kind of matches with the jacket, they

11  close. If you look at the boots, they're gray. Look

12  (indicating).

13          THE COURT:   I see the boots. I'm just saying that

14  the colors that you're describing are not, shall we say,

15  being picked up as clearly on the camera.

16  BY MS. ATTIAS:

17  Q.   Torrell, as you were watching this these last months in

18  video review, how was it that you picked out the person you

19  called "the girl"?

20  A.   Oh, I had to slow it down and it shows her skipping out

21  the house out the back way. I'll get to that and show you.

22  That's how I knew it was her. I seen this, then I

23  followed -- once I found myself, then I started following,

24  rewinding it real slow and just followed the whole thing.

25  Q.   And was there an item of --

---

Saxon - Direct (Attias)

1          MS. ATTIAS:   Judge, I'm going ask from here so I

2  can see the screen.

3          THE COURT:   That's fine.

4  BY MS. ATTIAS:

5  Q.   Was there an item of her clothing that stood out for

6  you?

7  A.   The sweater.

8  Q.   The girl?

9  A.   Yeah. Her sweater. I remember she had a hoody on.

10          MS. ATTIAS:   And 11:53.

11  A.   Could you all make it small again? I can't see

12  everything that's on there.

13          MS. ATTIAS:   Judge, we're going to move ahead a

14  whole bunch now, but it only unfortunately goes ahead by two

15  seconds at a time.

16          THE COURT:   Okay.

17          (Pause)

18          MS. ATTIAS:   While Ms. Tull is finding the next

19  spot, 11:53, last week I had marked an item as Defendant's A

20  for identification, this time, without objection from the

21  government, I move it in as Defense A in evidence.

22          THE COURT:   No objection?

23          MR. GERBER:   No, your Honor.

24          THE COURT:   Defense A will be admitted.

25          (Defendant Exhibit A received in evidence)

---

Saxon - Direct (Attias)

1  BY MS. ATTIAS:

2          MS. ATTIAS:   And, your Honor, I'm going to hand it

3  up for you to take a look at, but for the record, it is a

4  prisoner's personal property record, and I have obtained

5  this from Mr. Saxon's girlfriend who went to the Middletown

6  Police Station to pick up some property of his reflected on

7  this property receipt, and I actually showed it to Officer

8  Artola, of course he had nothing to do with it, reflected on

9  here were various items that were returned to his family

10  member, including blue jeans, a black belt and a gray zip-up

11  as well as some other items. I'm going to hand that up to

12  the Court.

13          There was a vodka bottle that was left with the

14  Middletown PD, and New York State ID, two credit cards, a

15  date book, a gray zip-up, blue jeans and a black hat. These

16  items were taken by the police and then returned with the

17  exception of the bottle. Black belt. Blue jeans, black

18  belt, gray zip-up. I don't know if you want to take a look

19  at it now while we're --

20          THE COURT:   Sure.

21  A.   If you want, you could speed it up. It goes straight

22  to it.

23          MS. ATTIAS:   I don't know if our cameras --

24  A.   If they move to 16 or to all, it will speed up to the

25  top.

Saxon - Direct (Attias)

1  could be easier if I could stand next him when he's pointing
2  things out.
3          THE COURT:   I don't see any individuals in this
4  screen shot at all, unless, there's a store there.  There
5  appears to be a store all the way to the right-hand side.
6  BY MS. ATTIAS:
7  Q.   So Ms. Tull just put an arrow at the bottom.
8  A.   Yeah.  That's the girl.  That's me.
9  Q.   The double arrow is you?
10  A.   The double arrow is me.  Yes.
11          MS. ATTIAS:   Can you keep on going, please?
12  A.   That's me crossing the street.
13  Q.   Okay.  You're crossing the street right now?
14          MS. ATTIAS:   Judge, I wasn't going to put times on
15  each of these stops and starts --
16          THE COURT:   Before you put times, how can you
17  tell, I can't tell that that's anything other than a stick
18  figure, quite honestly.
19          How do you know that that's you?
20          THE WITNESS:   Because in my -- I could blow this
21  right here on the side, you could blow it up and you could
22  see everything that I have on.  Plus, if you follow me all
23  through this camera, you see me a couple times real clear.
24          THE COURT:   Okay.  Well, when you see yourself
25  real clear, you let me know.  Okay?

Saxon - Direct (Attias)

1          Go ahead.
2  A.   Number two right here or you could do split screens
3  right there from that.  Can you leave it on one from that?
4  When it's like that, I can't really see it.
5  Q.   So you needed the smaller view again?
6  A.   Yeah.  And if it's possible, because my screen is like
7  hallway, I'm only seeing half.  I know you could see more
8  than the screen.  I need to go up some here.
9          The way this is, you're not going to be able to see me
10  on the other side of the street.  I don't know if you push
11  this -- if you could get this camera piece to go up more
12  where you could see the side of the street, you'll be able
13  to see me.
14          MS. ATTIAS:   Could we try getting to 11:18?
15          THE WITNESS:   You need the other side of the
16  street.  I'm on the other side of the street and this is --
17  can you put it back on one?  Because on two I can't tell
18  what's going on.
19  Q.   Okay.
20  A.   I can't see what's going on with two times.  Could you
21  put it back on one and could you fix it so I could see the
22  other side of the street?  Because I'm not on this side of
23  the street.
24  Q.   Okay.  Now we're going to play from about 11:18 and
25  when you see something that you recognize, Torrell, I would

Saxon - Direct (Attias)

1  like you to point that out.
2  A.   Excuse me.
3          MS. ATTIAS:   Can you stop it right there?
4  Q.   Torrell, what do we see right there 11:18?
5  A.   I'm trying to tell you, how you all have this thing,
6  there's a whole nother side.  The same thing I'm looking at
7  all the time.  The camera is too low, you're not showing the
8  other side.  The other side you could see me.  It's the side
9  of the street.  Right now you're showing the right-hand
10  side, you should be showing the left-hand side of the
11  street.
12          There I go right there.  That's me and the girl right
13  there.
14          THE COURT:   On the left side.
15          THE WITNESS:   Yeah.
16          THE COURT:   Lower left.
17          THE WITNESS:   Lower left.  That's me with the gray
18  jacket, blue pants, my black hat.  She got on like a dark
19  sweater.
20          THE COURT:   I'm sorry, which one are you?
21          THE WITNESS:   I'm the one on right side.  She's
22  the one with the hoody, the blue hoody.  She's got on blue
23  jeans and the white sneakers.
24  Q.   And that is you and the girl that you bumped into, the
25  woman you said that you know for a few years?

Saxon - Direct (Attias)

1  A.   She was with me that whole entire hour before the scene
2  and everything.
3  Q.   Okay.  So, in this, where we had the picture stopped
4  right here, this is you and this woman walking up North
5  Street?
6  A.   This is going back down.  We already walked up towards
7  North Street, that was the first time when you first put the
8  arrows up, she was walking by the store and I crossed the
9  street.  Now we going back down towards 120 Wickham.  But
10  she's -- like we going back up towards Wickham.
11          MS. ATTIAS:   Okay.  Could you go to 11:21?  And
12  more or less 30 seconds or so.
13  A.   You can't blow it up.  When you blow it up, I can't see
14  nothing.  You've got to keep it on one.
15  Q.   She'll make it smaller again.
16          Okay.  Torrell, we're going to play it from here.  And
17  when you see anything that you recognize, please start to
18  describe that.
19  A.   That's me coming back.  I just passed by.  We just
20  passed by on the left-hand side.
21  Q.   And, again, how do you know it's you?
22  A.   If you stop it, you could see me, you could see me and
23  her a little clearer.  Right there.
24  Q.   So those two figures that you see right there --
25  A.   If you blow it up, you could see that's me and that's

Saxon - Direct (Attias)

1  Q.   When you were taken to the police station, how many
2  pairs of pants were you wearing?
3  A.   One.
4  Q.   And are those the same ones you're wearing now?
5  A.   Yes.
6  Q.   And did you have your blue pants anymore?
7  A.   No.
8  Q.   What happened to those blue pants, if you know?
9  A.   At the time I don't know, but I later on found out that
10  they was taken to the police station --
11       MR. GERBER:   Objection, your Honor.
12       THE COURT:   Sustained.
13  BY MS. ATTIAS:
14  Q.   When you were arrested, Torrell, where were your pills?
15  A.   Everything was gone. I didn't have nothing. I don't
16  know where they at.
17  Q.   Do you have any idea how many pills you had in that
18  little pouch that night?
19  A.   Yeah.
20  Q.   How many?
21  A.   Close to like around 30.
22  Q.   And to be clear, did you have a prescription for those
23  pills?
24  A.   Some of them.
25  Q.   But you weren't allowed to sell them, right, that was

Saxon - Direct (Attias)

1  illegal?
2  A.   Yes.
3  Q.   And were you -- the shoes that you said you were
4  wearing and that you're wearing now --
5  A.   Yes.
6  Q.   -- those were still on your feet when the police took
7  you in?
8  A.   Yeah.
9  Q.   So what was missing when the police came and they
10  brought you into the police station, what had you been
11  wearing that you were not wearing anymore?
12  A.   My hat, my gray coat and my pants was off, my blue
13  pants that was covering up the these, the brown ones.
14  Q.   And you walked in with pills, and when the police came,
15  you didn't have pills.
16  A.   No, they said there's no pills.
17  Q.   Were you originally charged in the state?
18  A.   Uh-hum.
19  Q.   Were you ever charged with possession of pills or pill
20  sale in the state?
21  A.   No. Wait. Excuse me. You mean for this situation?
22  Q.   Yes.
23  A.   I had a pill case --
24  Q.   For this situation.
25  A.   No.

Saxon - Direct (Attias)

1       MS. ATTIAS:   Judge, there is a DVD in this case
2  that we are, I'm going to be entering into evidence without
3  objection as Defendant D. And at this time I'm going to ask
4  that -- Ms. Tull and I, I've given her some start-and-stop
5  points, I'm going to ask that some of that be played and
6  after parts are played, I'm going to ask Mr. Saxon describe
7  for us what it is we're watching in the video tapes. In the
8  videotape.
9       THE COURT:   This is coming in without objection?
10       MR. GERBER:   That's correct, your Honor. Just to
11  be clear on what it is that we're not objecting to. This is
12  video footage from City of Middletown police cameras. I can
13  tell you what's on the disk that I believe Ms. Attias is
14  entering into evidence. This is video footage from
15  approximately 11:00 a.m. on March 24, 2012 to approximately
16  1:00 a.m. on March 25, 2012.
17       MS. ATTIAS:   P.m.
18       MR. GERBER:   It's from, excuse me, 11:00 p.m. on
19  March 24, 2012, excuse me, 11:00 p.m. March 24, 2012. The
20  video footage is from approximately 11:00 p.m. on March 24,
21  2012 to approximately 1:00 a.m. on March 25, 2012. And
22  these are police cameras in the vicinity of 135 North
23  Street. That's one camera. A second camera in the vicinity
24  of Thrall Park.
25       THE COURT:   Of what park?

Saxon - Direct (Attias)

1       MR. GERBER:   Thrall, T-H-R-A-L-L. A third police
2  camera in the vicinity of the corner of Wickham and North,
3  and a fourth camera at the corner of Wickham and Low.
4       MS. ATTIAS:   So, if we could, with Mr. Gerber's
5  clarify, I'm going to be asking that action be played from
6  camera ten and camera eight. If we could just clarify,
7  camera ten is placed where? Oh, you don't know.
8       All right. Let's just get to the camera. Okay,
9  could you please start, Ms. Tull, at 11:13?
10  BY MS. ATTIAS:
11  Q.   Torrell, just watch this on your screen, and we're
12  going to watch for a little bit, and I'm going to ask you to
13  describe what you're seeing.
14       (Tape played)
15  Q.   Actually, as soon as you see anything you recognize in
16  this, please ask us to stop and we'll stop there.
17  A.   Oh, you can stop.
18  Q.   What is it that you want to point out?
19  A.   This screen keeps blinking. I can't --
20  Q.   Okay. So --
21  A.   That's the girl right there and that's me. We was
22  in front of 120 Wickham during that -- from like that whole
23  from 11 all the way down like we was right here. That's me
24  walking, and that's the girl right in front of me.
25       MS. ATTIAS:   You know what, Judge, I think it

Saxon - Direct (Attias)

1  Q.  So do you know if she knocked on the door?
2  A.  No.
3  Q.  And what happened then?
4  A.  I walked in right behind her and the door was open, she
5  was talking to somebody in Spanish.
6  Q.  Did you know that she could speak Spanish before that?
7  A.  No.
8  Q.  Had you ever heard her speak Spanish?
9  A.  No.
10  Q.  Do you know what she said?
11  A.  No.
12  Q.  Do you know who she was talking to?
13  A.  It was a couple of -- It was a couple of people in
14  there. I don't know exactly which one she was talking to.
15  Q.  And after they spoke to each other in Spanish, then
16  what happened?
17  A.  I was saying, I went to the side and I kept looking at
18  her like, what's going on? And she just kept talking for a
19  few minutes. Then she wound up telling me, yo, go ahead,
20  you could go in. As I went to go in, she cut in front of
21  me, and when we got inside, the door closed and the kid in
22  the picture, Rodriguez, grabbed her, pulled her back, and
23  three, about four or five guys, they rushed me, grabbed me
24  and threw me up against the wall.
25  Q.  Torrell, when you went into the apartment --

Saxon - Direct (Attias)

1  A.  Yeah.
2  Q.  -- what was the reason you were going into that
3  apartment?
4  A.  I was going in there with her so she could help me get
5  rid of the pills.
6  Q.  Sell the pills.
7  A.  Yeah.
8  Q.  And, now, you walk in, I just want to make sure I'm
9  getting this, she cuts in front you?
10  A.  Yeah. She was right here like in front of the door and
11  I was on the side of the door, I was in front of the next
12  apartment when she like told me to go ahead. I went to walk
13  in, as I went to walk in, she just cut right in front of me.
14  Q.  When you say the man in the picture, was that the
15  picture Mr. Gerber just entered into evidence now?
16  A.  Yeah.
17  Q.  So that man took her?
18  A.  Yeah. He grabbed her and pulled her back behind him.
19  Q.  And where did he take her to?
20  A.  I just seen him grab her and pulled her behind him.
21  The four, five guys, they just rushed me, I was
22  concentrating on them.
23  Q.  And what happened when they rushed you, please describe
24  that in detail.
25  A.  They went in my pocket. They was taking my clothes

Saxon - Direct (Attias)

1  off, they was pushing me against the wall, I was fighting
2  them. It was a big struggle.
3  Q.  Did you have a gun on you, Torrell?
4  A.  No.
5  Q.  Were there gunshots?
6  A.  Yeah.
7  Q.  What happened, as far as you know, with the gun?
8      Did you see a gun?
9  A.  The gun was thrown in my face, and the kid with that
10  picture that they told -- I hit him with an Arizona bottle.
11  That was the bottle, when he, when they came in my face, I
12  jumped back and I swung, hit him with the bottle and I
13  started fighting with the gun.
14  Q.  So, the kid in the picture --
15      MS. ATTIAS:  Mr. Gerber, what number was that?
16  BY MS. ATTIAS:
17  Q.  Okay, Torrell, I want to make sure, this is Government
18  Exhibit 151; is this the person you're talking about?
19  A.  Yes.
20  Q.  And you said he's the guy that had a gun?
21  A.  Yeah. That's the one that threw it in my face.
22  Q.  Did you see how he was holding the gun or what hand?
23  A.  When the gun went in my face, I just started pushing it
24  back, fighting. We was struggling. The other guys, they
25  was still doing whatever they were doing, but I was

Saxon - Direct (Attias)

1  concentrating on the gun. They was still wrestling with me.
2  Q.  And you took your bottle that you were holding and you
3  hit him in the face?
4  A.  I grabbed -- I know, like I swung the bottle and I hit
5  him across the face.
6  Q.  And what happened after that?
7  A.  I started struggling with the gun.
8  Q.  And did the gun go off?
9  A.  Yeah.
10  Q.  Do you know how many times the gun went off?
11  A.  I only heard one shot.
12  Q.  And did -- describe that shot, when in the course of
13  the struggle did you hear a gun go off?
14  A.  When I was struggling with him, we was all over that
15  place and I just know it went off. It went off by my ear.
16  I lost my hearing and everything.
17  Q.  And then what happened? You're all struggling, the gun
18  goes off.
19  A.  The gun went off. We were struggling. Some point in
20  time I went to the floor. My clothes was off. They was
21  taking my clothes off going through my pockets. From there
22  I was screaming.
23  Q.  And when you said your clothes were off, you said you
24  were wearing two pairs of pants.
25  A.  Yeah.

177

*Saxon - Direct (Attles)*

1  A.    Yeah, I got a message on the phone, and I had got just

2  It's like a request, they ask was I in town and they asked

178

*Saxon - Direct (Attles)*

1  Q.    You put your pills in there?

2  A.    Yeah.

181

Saxon - Direct (Attias)

1  Q.   So what happened after that?
2  A.   I left. I went downstairs and I started walking
   towards North Street.
4  Q.   How far is it from 120 Wickham to North Street?
5  A.   Like a half mile.
6  Q.   And what happened as you got to North Street?
7  A.   When I got to North Street, I made a left and I walked
8  down towards like a laundromat, and when I got there, there
9  was a girl that I seen around that I know and she came to me
10 she asked me if I had work on me.
11 Q.   And what happened?
12 A.   And I told her, yeah.
13       Then she asked me, what? I told her I what I had.
14       She asked me I drinking. I told her, yeah.
15       She asked me did I want to hang out with her. I said,
16 why?
17       She said, because you shouldn't be out here, you
18 shouldn't be out here drunk like that. If you want, I could
19 take you someplace where you could be comfortable and you
20 could get your stuff off, meaning that I could give her the
21 pills.
22 Q.   Okay.  Did that happen right away when you saw her or
23 did you do anything else first?
24 A.   No, after -- excuse me, repeat the question.
25 Q.   After you left 120 Wickham, were you out there trying

182

Saxon - Direct (Attias)

1  to sell your pills?
2  A.   I was out there.
3  Q.   Before you bumped into this woman, were you trying to
4  sell pills on the street when 120 Wickham was empty?
5  A.   The time I left 120 Wickham, I went straight down, I
6  went straight towards North Street.  I was just walking.
7  Q.   Were you drinking as you were walking?
8  A.   Yes.
9  Q.   When you got to North Street, that's when you saw the
10 woman?
11 A.   Yes.
12 Q.   Did you and she do anything together?
13 A.   We walked around after she told me that because she
14 really said she was going to take me to the house, but she
15 walked down, walked up the hill, came back down and then
16 went to a couple houses before we got to the house that she
17 was talking about.
18 Q.   And what were you doing, did you follow her while she
19 was walking different places, too?
20 A.   Yeah.
21 Q.   And did you make any pill sales on the street?
22 A.   No.
23 Q.   Did you have any money on you when you left the house
24 that evening?
25 A.   Yes.

183

Saxon - Direct (Attias)

1  Q.   And do you know how much?
2  A.   I had $20.
3  Q.   Then you said you bought the Four Loko; right?
4  A.   Yeah.
5  Q.   How much did you have left after that?
6  A.   16.75, $17.
7  Q.   So, when she said she was going to take you to a house
8  where you could get the work off --
9  A.   Yeah.
10 Q.   -- did you know where she was talking about?
11 A.   No.
12 Q.   Did you ask her?
13 A.   She just told me to come --
14 Q.   Did you know this woman already?
15 A.   Yeah, I know her.
16 Q.   How long had you known her for about?
17 A.   I met her about three years ago.
18 Q.   Three years ago from now or three years before the
19 incident?
20 A.   From the incident.  Over three years.
21 Q.   So you walked with her along North Street for a while?
22 A.   Yes.
23 Q.   Do you have any idea how long you were out there on
24 North Street?
25 A.   I was out there for a while.

184

Saxon - Direct (Attias)

1  Q.   And then where did you go?
2  A.   After we was walking around, we went into the store,
3  out the store, like we was back and forth, and then we went
4  over to that 221 North Street.
5  Q.   Had you ever been there before?
6  A.   No.
7  Q.   And what happened when you got to that house?
8  A.   She told me to wait on the porch and she went inside.
9  She --
10 Q.   Torrell, one second.  Did you see how she got inside?
11 A.   The front door was open.
12 Q.   It was not locked?
13 A.   The first door is open.
14 Q.   The first door -- okay.  And then to get into --
15 A.   To the building, to the apartment -- not to the
16 apartment, to the building.
17 Q.   So there's an outer door.
18 A.   Yeah, where the porch is at.
19 Q.   Okay.
20 A.   There's a door and there's two other doors to the
21 apartments.
22 Q.   And did you see if she knocked?
23 A.   No, I didn't see.
24 Q.   How far back from her were you when she went in?
25 A.   I was on the porch up against the rail area.

4   Q.   How long had you been out of town?

5   A.   Yeah.

6   Q.   How long had you been out of town for?

7   A.   A month.

8   Q.   And where were you during that time?

9   A.   With my girlfriend in Yonkers.

10  Q.   And where was your phone that these messages had been

11  on, where was it while you were in Yonkers?

12  A.   In Middletown.

13  Q.   So, can you describe, you said you put the pills in a

14  little pouch?

15  A.   Yeah.

16  Q.   About how big was that?  You can show us with your

17  fingers.

18  A.   Pouch is like this big, but it's ultra thin

19  (indicating).  It's thin.  It's like --

20  Q.   About two and a half to three inches across?

21  A.   It's kind of like the money, like people used to have

22  the change, like loose change pouches.  They're thin.  It's

23  that.

24  Q.   The kind that squashes flat?

25  A.   Yeah.

1   Which pants did those go into?

5   A.   My brown pants pocket, the ones I have on now, the

6   second -- the first pair that I put on.

7   Q.   And then over that you put a second pair of pants.

8   A.   Yeah.

9   Q.   What were you wearing on top?

10  A.   The blue jeans and up top I had on a white shirt and I

11  had a jacket and my hat.

12  Q.   What kind of hat?

13  A.   I had a gray jacket, an Echo jacket and a black hat.

14  Q.   Now when you left the house, Torrell, where did you go?

15  A.   From the house I went to Sam's store.

16  Q.   What kind of store is Sam's store?

17  A.   It's like a grocery store.

18  Q.   What did you buy there?

19  A.   I bought a Four Loko.

20  Q.   What is Four Loko?

21  A.   Four Loko is, it's like liquor.  It's liquor.

22  Q.   And after you bought the Four Loko at Sam's, then what

23  did you do?

24  A.   I took the Four Loko, because I had an Arizona bottle I

25  had the Hennessy in from the house, and I took the Four Loko

179

## Saxon - Direct (Attles)

1   and poured half of it into the Hennessy bottle, then I

2   walked down to 120 Wickham.

3   Q.   Okay.  So, the Arizona bottle, is that the Arizona

4   Iced Tea you're talking about?

5   A.   Yes.

6   Q.   Was there any iced tea left in it?

7   A.   No, it was just Hennessy.

8   Q.   Hennessy.  And you poured half of that into the Arizona

9   bottle?

10  A.   I poured Hennessy into the Arizona bottle and I poured

11  half the Four Loko.

12  Q.   Then you went -- how did you go toward 1 -- you said

13  you went to 120 Wickham?

14  A.   Yes.

15  Q.   What was 120 Wickham?

16  A.   120 Wickham was where the people told me, request to

17  come to.  It's like a drug area.

18  Q.   How many messages asking for pills were on your

19  cellphone, if you remember?

20  A.   I don't remember.

21  Q.   More than one?

22  A.   Yeah.

23  Q.   And the people that left those messages asked you to

24  meet them at 120 Wickham?

25  A.   It was a request I had just got, and it basically asked

180

## Saxon - Direct (Attles)

1   me was I in town.  Then it said, are you in the area and do

2   you have work.

3   Q.   And "work" means?

4   A.   Pills.

5   Q.   So you were already known for selling pills around

6   Middletown to some people?

7   A.   To some people.

8   Q.   And did you go to 120 Wickham?

9   A.   Yes.

10  Q.   Did you go straight there from buying the Four Loko or

11  did you do anything else first?

12  A.   I went straight to 120 Wickham.

13  Q.   What happened when you got to 120 Wickham?

14  A.   I walked upstairs.  I went looking around, and there

15  was nobody there, nobody in the apartments there and nobody

16  downstairs.

17  Q.   Can you just describe a little bit what 120 Wickham

18  looks like, is it a house, an apartment building?

19  A.   It's an apartment building, but it's nothing but

20  people -- drug addicts that live in there.

21  Q.   As far as you knew, how long had 120 Wickham been a

22  drug spot?

23  A.   Since like, long as I know, like 2009.

24  Q.   And that night it seemed to be empty?

25  A.   Yeah.

1     THE COURT:  Anything further for Officer
2 Brownstein?
3         MR. GERBER:  No, your Honor.
4         MS. ATTIAS:  No, Judge.
5     THE COURT:  Officer Brownstein, you may step down.
6     THE WITNESS:  Thank you, Judge.
7     (Witness excused)
8     MS. ATTIAS:  And, your Honor, I want to make sure
9 what I entered as Defense E you actually had in a binder
10 although it was not yet in evidence as Government --
11     THE COURT:  226.
12     MS. ATTIAS:  Yes.  So do you have that or do you
13 want my --
14     THE COURT:  I have 226.
15     MS. ATTIAS:  Okay.  And that's now Defense E.
16     THE COURT:  Yes.
17     MS. ATTIAS:  At this time the defense calls
18 Torrell Saxon to the stand.
19 TORRELL SAXON, having been duly sworn, was called
20 as a witness and testified as follows:
21     THE CLERK:  Please be seated.  State your full
22 name and spell your full name for the record.
23     THE WITNESS:  Torrell Saxon, T-O-R-R-E-L-L,
24 S-A-X-O-N.
25 DIRECT EXAMINATION

1 BY MS. ATTIAS:
2 Q.    Torrell, I'm going to draw your attention to the night
3 of March 24 and early morning of March 25, 2012 of last
4 year, 2012; do you recall that night?
5 A.    Yes.
6 Q.    Earlier that day, where had you been?
7 A.    I was in Yonkers with my girlfriend.
8 Q.    And is she in court today?
9 A.    Yes.
10 Q.    Can you point her out for Judge Ramos?
11 A.    She's back there.
12 Q.    The youngest of the three women in the back?
13 Prettiest?  Maybe not.  It's hard to know.
14     At some point, did you come back to Middletown?
15 A.    Yes.
16 Q.    About what time was that, if you know?
17 A.    I'm not sure.  It was around seven or eight.
18 Q.    And what were you -- where did you go?
19 A.    I went to my aunt's house in Middletown.
20 Q.    And what were you doing in her house that evening?
21 A.    I had something to eat, and then I had a little bit to
22 drink.
23 Q.    What were you drinking?
24 A.    Hennessy.
25 Q.    Hennessy?

1 A.    Yes.
2 Q.    And, if you recall, how much did you have to drink
3 while you were in the house?
4 A.    Not that much.
5 Q.    Before you left the house -- well, did you leave the
6 house that evening?
7 A.    Yes.
8 Q.    And do you know what time that was?
9 A.    No.
10 Q.    Before you left the house, did you prepare anything to
11 take with you?
12 A.    Yes.
13 Q.    What did you do?
14 A.    I got dressed.  I went and got, it's called a little
15 pouch that I put pills and stuff in, and I got dressed with
16 two pair of pants on.  I put the brown pants that I have on
17 now, then I put on another pair of blue pants over it and I
18 put the pouch inside my left pocket.
19 Q.    Okay.  Let's just take that a little bit more slowly.
20 When you got dressed, you're saying you put on two pairs of
21 pants?
22 A.    Yes.
23 Q.    One is, and one of them is the pants that you're
24 wearing now?
25 A.    Yes.

1 Q.    And what shoes were you wearing?
2 A.    Same shoes I have on.
3 Q.    And over -- and what kind of shoes are they?
4 A.    Ugg boots.
5 Q.    Could you just stand up please so the Judge can just
6 take a look at your bottom half of you?
7 A.    (Witness complying)
8     THE COURT:  Okay.
9 BY MS. ATTIAS:
10 Q.    And over those brown pants, you say that there was
11 another pair of pants?
12 A.    Yes.
13 Q.    What color were they?
14 A.    Blue.
15 Q.    Why were you wearing two pairs of pants?
16 A.    Because when I go out, I had received a call, a message
17 and somebody had asked for some pills.  So I took my little
18 pouch that I usually keep the pills in.  I put it in my
19 pocket.  When I put on two pair of pants, if I go to get
20 searched, they don't feel it because it's thin.  So I had
21 the extra pair of pants on to cover up the pouch.
22 Q.    So, to be clear, When you say "pills," were these pills
23 that you intended to sell illegally that night?
24 A.    Yes.
25 Q.    And you said that you had messages?

**169**

Brownstein - Direct (Attias)

1  A.  Yes.

2  Q.  So you don't know why you did not find a bullet in that

3  room; correct?

4  A.  That's correct.

5  Q.  Were you surprised not to find a bullet?

6  A.  No.

7  Q.  Did you attempt in any way to ascertain the caliber of

8  the bullet that would have made strike A?

9  A.  I knew what kind of bullet.  I knew it was a .22,

10  semi-automatic pistol.

11  Q.  So you knew that was the gun, the bullet that caused

12  that?

13  A.  That was the only gun that we covered in the residence.

14  Q.  You don't know there was another gun in the residence

15  that night; do you?

16  A.  No.

17       MS. ATTIAS:  No further questions.

18       Thank you very much.

19       THE WITNESS:  You're welcome.

20       THE COURT:  Cross examination?

21       MR. GERBER:  Yes, your Honor.

22  CROSS EXAMINATION

23  BY MR. GERBER:

24  Q.  Good afternoon, Officer Brownstein.  Were you the first

25  police officer on the scene at 221 North Street, Apartment

---

**170**

Brownstein - Cross (Gerber)

1  One?

2  A.  No.

3  Q.  Do you know where the .22 caliber gun was located when

4  the police first arrived on the scene?

5  A.  I was advised that --

6       MS. ATTIAS:  Objection.

7  A.  -- it was in apartment room number one.

8       THE COURT:  Sustained.

9  Q.  Do you know from your own experience where the gun was

10  when the police arrived on the scene?

11  A.  No.

12       MR. GERBER:  No further questions, your Honor.

13       THE COURT:  Officer Brownstein, you indicated that

14  you took pictures of an individual that you were told was a

15  victim of this incident?

16       THE WITNESS:  Yes.

17       THE COURT:  As you sit here, do you have an

18  independent recollection of the injuries that this victim

19  sustained that you photographed?

20       THE WITNESS:  He had a of couple marks on the side

21  of his forehead.

22       THE COURT:  What types of marks, if you recall?

23       THE WITNESS:  Just like being struck somehow.

24       THE COURT:  Okay.  Thank you.

25       MR. BLOOM:  Can we have one moment, your Honor,

---

**171**

Brownstein - Cross (Gerber)

1  before the witness leaves the stand?

2       THE COURT:  I'm sorry, I can't hear you.

3       MR. BLOOM:  Could we just have one moment, your

4  Honor?

5       THE COURT:  Sure.

6       (Pause)

7       MR. GERBER:  Your Honor, with the Court's

8  permission, we have the photographs to which Officer

9  Brownstein is referring, and with the Court's permission, we

10  would inquire of Officer Brownstein regarding these

11  photographs and offer them into evidence.

12       THE COURT:  Well, let's do it this way first.  Do

13  you have any redirect examination?

14       MS. ATTIAS:  I do not, and I'm not going to object

15  to the introduction of the photos.

16       THE COURT:  Okay.

17       (Pause)

18       MR. GERBER:  Your Honor, may I approach?

19       THE COURT:  You may.

20  BY MR. GERBER:

21  Q.  Officer Brownstein, I show you what has been marked as

22  Government Exhibits 151, 152 and 153.  Do you recognize

23  those photographs?

24  A.  Yes, I do.

25  Q.  And what do you recognize them to be?

---

**172**

Brownstein - Cross (Gerber)

1  A.  They're the photographs I took of the victim from 221

2  North Street.

3       MR. GERBER:  Your Honor, at this time the

4  Government offers Exhibits 151, 152, 153 into evidence.

5       MS. ATTIAS:  Judge, I don't have any objection but

6  since we have been naming some names here, I just want to be

7  clear that I think that this is V-1 whose reports were read

8  earlier, Rodrigo the younger.

9       Is that right?

10       MR. GERBER:  That's correct.  These are pictures

11  of Rodrigo Perez-Suarez.

12       THE COURT:  Very well.  There being no objection,

13  151, 152 and 153 was it?

14       MR. GERBER:  Yes, your Honor.

15       THE COURT:  Will be received.

16       (Government's Exhibit 151,152, 153 received in

17  evidence)

18       MS. ATTIAS:  And I have nothing further for this

19  witness, your Honor.

20       THE COURT:  I don't have the copies of those

21  exhibits; do I?

22       MR. GERBER:  No, you do not, your Honor.

23       THE COURT:  Could I see those?

24       MR. GERBER:  Of course.

25       (Pause)

Brownstein - Direct (Attias)

1  known to be, for want of a better word, drug houses?
2        MR. GERBER:   Objection, your Honor.
3        THE COURT:   If he knows.
4  A.   Yes.
5  Q.   I know it's my question, but when you say "yes," can
6  you please describe for the Court, please, what you mean by
7  that?
8  A.   There are known houses that drug users and drug dealers
9  reside in and use for their habits.
10 Q.   And according to -- was one of those, around the time
11 of this incident, was one of those 120 Wickham?
12 A.   Yes.
13 Q.   And how far is 120 Wickham from 221 North Street?
14 A.   Within a half mile.
15 Q.   And had you ever had contact with 221 North Street
16 before the morning you had responded to this incident?
17 A.   I don't understand the question.
18 Q.   Had you ever had to deal with any drugs, arrests,
19 issues that happened to 221 North Street before March 25,
20 2012?
21 A.   Personally, no.
22 Q.   Are you aware of other incidents that had happened at
23 that house --
24       MR. GERBER:   Objection, your Honor.
25 Q.   -- just a few months prior to this incident?

Brownstein - Direct (Attias)

1        MR. GERBER:   Objection, your Honor.  Calls for
2  hearsay.
3        THE COURT:   Sustained.
4  BY MS. ATTIAS:
5  Q.   Are you aware, just a "yes" or "no," there were other
6  crime scene investigations in that area prior to that night?
7        MR. GERBER:   Objection, your Honor.
8        THE COURT:   Sustained to the form.
9  BY MS. ATTIAS:
10 Q.   Officer Brownstein, when you took the photos of strike
11 A, that's the bullet mark in bedroom one, did you use any --
12 make any measurements of the bullet strike itself?
13 A.   Yes.
14 Q.   And what kind of measurements did you make of the
15 bullet strike?  I'm not talking about floor to strike.  You
16 told us you measured from the floor to where the strike hit
17 the door; correct?
18 A.   Yes.
19 Q.   And what other measurements did you take?
20 A.   If you're asking me the size of it --
21 Q.   No, I'm not asking you the size.  What kind of
22 techniques did you use, is my question.
23 A.   Use a tape measure.
24 Q.   And when you took the photos of the door, was that tape
25 measure reflected in the photos?

Brownstein - Direct (Attias)

1  A.   No.
2  Q.   And do you normally try to take a photo with the
3  measurement against whatever it is you're measuring so other
4  people can look at it down the line like now?
5  A.   At times, yes.
6  Q.   And when you say you used a tape measure, what did you
7  do with that tape measure?
8  A.   I put one end on the floor and one up to where the
9  bullet strike was.
10 Q.   Okay.  But of the strike itself, you didn't take any
11 measurements or anything; correct?
12 A.   Correct.
13 Q.   Did you put any sort of a dowel through the strike,
14 strike A, in order to ascertain whatever you could about
15 that?
16 A.   Yes.
17 Q.   And can you please describe that for the Court?
18 A.   Describe what I --
19 Q.   What you did.  Yes.
20 A.   It's part of the trajectory equipment I have, basically
21 knitting needles connected to each other, and just put it
22 through the hole to get the directionality of the
23 projectile.
24 Q.   Are they actually knitting needles?
25 A.   No, they're not.

Brownstein - Direct (Attias)

1  Q.   Okay.  It's some sort of a long, skinny dowel?
2  A.   Yes.
3  Q.   And did it go through the strike hole?
4  A.   Yes.
5  Q.   And using that line that you were able to come out
6  with, again, did you look along the wall and see if you
7  could see anything at the height where a bullet might have
8  hit?
9  A.   Yes, I did.
10 Q.   And did you see anything?
11 A.   No.
12 Q.   And did you thoroughly search bedroom one for that
13 bullet?
14 A.   Yes.
15 Q.   And found nothing?
16 A.   Correct.
17 Q.   What, in your experience, Detective, Officer
18 Brownstein, could have been the cause of that?
19 A.   Could be numerous things.
20 Q.   Like?
21 A.   People that are, civilians that are in the house
22 getting the projectile in the bottom of their shoes, police
23 officers in the bottom of their shoes or the projectile
24 could just disintegrate.
25 Q.   From the kind of hit or whatever it hit?

Brownstein - Direct (Attias)

1   A.   Yes.

2   Q.   And how would you describe a cartridge, a bullet?

3        Are there fingerprints?  Is that a good surface for

4   fingerprints to be left on and found on?

5   A.   It can be.

6   Q.   And a glass from a liquor bottle, how would that be?

7   A.   It can be as well.

8   Q.   And do you see the gloves depicted in the photo on the

9   floor?

10  A.   Yes.

11  Q.   The inside of latex gloves, how were those -- what kind

12  of a surface is that for recovering fingerprints from?

13  A.   You can get fingerprints out of there.  I never have in

14  my experience but you can.

15  Q.   And, so, did you process any evidence for fingerprints

16  that were -- that you found in the apartment?

17  A.   No.

18  Q.   And the shell casings on the floor, I don't remember if

19  I asked you, I'm sorry, the shell casings, the spent -- you

20  did not fingerprint those either; correct?

21  A.   Correct.

22  Q.   When you saw the gun on the floor of bedroom one, do

23  you recall if there was anything else around it on the floor

24  or if it was just by itself?

25  A.   I didn't see anything else beside it.

Brownstein - Direct (Attias)

1   Q.   No dirty clothes, any dirty clothes near it?

2   A.   Not next to the gun.

3   Q.   That appeared to be laundry?

4   A.   Not next on the gun.

5   Q.   About how far away from the gun was the laundry, the

6   dirty clothing?

7   A.   I believe the laundry was as you first walked in to the

8   wall on the left.

9   Q.   And how far, about how far away?

10  A.   I didn't take measurements of that.

11  Q.   I'm asking you sort of ballpark, 2 feet, 4 feet,

12  5 feet?

13  A.   At least five and a half, six feet.

14  Q.   Away from the laundry.

15  A.   Yes.

16  Q.   Now at some point -- well, were you aware that someone

17  brought a roll of paper towels into, I'm just asking if you

18  know, I don't know if you know this or not, that at some

19  point a roll of paper towels appeared with what appeared to

20  be a bullet hole in it?

21       Do you have any knowledge of that item?

22  A.   I don't recall.

23  Q.   That night, did you recover a paper towel with a bullet

24  hole in it?

25  A.   I don't believe I did.

Brownstein - Direct (Attias)

1   Q.   And did you find any deformed projectiles anywhere in

2   the apartment?

3   A.   No.

4   Q.   Now, officer you were just talking about some clothing

5   that was on the floor of bedroom one; right?

6        Do you know if there was any -- who that clothing

7   belonged to?

8   A.   No.

9   Q.   Did you have any contact with the people who lived

10  inside the apartment in your work on this case?

11  A.   Just took photographs of the victim.

12  Q.   When you say "the victim," who do you mean by that?

13  A.   Person they had brought back to the police station that

14  they interviewed.

15  Q.   Do you know what victim number he was?

16  A.   All I know is he resided in Apartment Number One.

17  Can't even tell you his name.

18  Q.   Do you know if any clothing was returned to the

19  defendant or a family member during the course of this in

20  the days after the defendant's arrest?

21  A.   Not to my knowledge.

22  Q.   Was there any DNA testing done in this case at all?

23  A.   No.

24  Q.   Now, I know you're Crime Scene and not a foot officer

25  or line-of-duty officer, but can you, would you describe the

Brownstein - Direct (Attias)

1   area of 221 North Street as a high-crime area?

2            MR. GERBER:   Objection, your Honor.

3            THE COURT:   There doesn't appear to be sufficient

4   foundation for the question.

5   BY MS. ATTIAS:

6   Q.   How long have you been on the Middletown police force?

7   A.   Twenty-eight years.

8   Q.   And in that 28 years, have you pretty much driven every

9   street in Middletown?

10  A.   Yes.

11  Q.   And are you familiar with the various areas of the

12  City?

13  A.   Yes.

14  Q.   And are some of the areas lower crime and some higher

15  crime?

16  A.   Yes.

17           MR. GERBER:   Objection, your Honor.

18           THE COURT:   Overruled.

19  BY MS. ATTIAS:

20  Q.   Are some lower drug areas and some higher drug areas?

21  A.   Yes.

22  Q.   And how would you describe the area of 221 North

23  Street?

24  A.   It's a higher drug, known drug area.

25  Q.   And are there certain houses or buildings that are

Brownstein - Direct - Attias

1    MS. ATTIAS:  Judge, I'm just going to approach for
2  a moment to just look at that third picture that I gave him.
3  BY MS. ATTIAS:
4  Q.   Officer Brownstein, did you take that photo?
5  A.   Again, I am not sure if I took this one or not. I
6  would have to look at my photos to let you know if this is
7  the same photo that I took.
8  Q.   From looking at that photo, are you able to identify
9  what it is a photo of?
10 A.   It's from the -- appears to be the back door going
11 towards the front door of the second apartment also.
12 Q.   Of 221 North Street, Apartment One.
13 A.   Yes.
14 Q.   And is it a fair and accurate representation of what
15 that area of Apartment 221 -- I'm sorry, 221 North Street,
16 Apartment One, looked like the morning that you were there
17 on March 25, 2012?
18 A.   From what I remember, yes.
19    MS. ATTIAS:  Judge, I move that into evidence as
20 Defense, I'm skipping a few, but it's going to be Defense E.
21    THE COURT:  Mr. Gerber?
22    MR. GERBER:  Your Honor, can we have one moment,
23 your Honor?
24    THE COURT:  Sure.
25    MR. GERBER:  Your Honor, we would ask to voir dire

Brownstein - Direct - Attias

1  the witness.
2    THE COURT:  Okay.
3    MR. GERBER:  If I may?
4    THE COURT:  You may.
5  VOIR DIRE EXAMINATION
6  BY MR. GERBER:
7  Q.   Officer Brownstein, do you recall if on the night when
8  you were in the apartment the table here was in the same
9  position as -- if the table was in the same
10 position as -- if the table was in the same position as it
11 is in Exhibit 226?
12 A.   I don't remember.
13 Q.   And do you recall whether the refrigerator here on the
14 left of the picture is in the same position as it was the
15 night you were in the apartment?
16 A.   I don't remember either.
17 Q.   And is it possible that they were moved between the
18 time when you were in the apartment and when this picture
19 was taken?
20 A.   I would guess it could be possible.  It's been over a
21 year.
22 Q.   You don't know when this picture was taken; do you?
23 A.   No.
24    MR. GERBER:  With that, no objection, your Honor.
25    THE COURT:  Okay.  It will be received.  That's
   Defense E?

Brownstein - Direct - Attias

1    MS. ATTIAS:  Yes.
2    (Defendant's Exhibit E received in evidence)
3  DIRECT EXAMINATION
4  BY MS. ATTIAS:  (Cont'd)
5  Q.   Officer Brownstein, I'm going to ask you to take a look
6  at Government's Exhibits 135 and 136 which are already in
7  evidence and ask you to take a look at those, please.
8  A.   (Viewing photographs)
9  Q.   Do you know if you took those photos?
10 A.   Yes, I did.
11 Q.   And what do those photos depict?
12 A.   This is room or Apartment Number One at 221 North
13 Street.  The flooring has a Cheez Doodle bag, bottle of Skol
14 Vodka, some keys, gloves and currency on the floor.
15    MS. ATTIAS:  Judge, I'm sorry, the government
16 doesn't actually have them.  I'll have the copies here and
17 it's probably easier to put them up on the screen.
18 Q.   Can you see that, Officer Brownstein?
19 A.   Yes, I can.
20 Q.   Do you actually recall taking this photo and recall the
21 room looking like this or part of the room that looked like
22 this?
23 A.   Yes.
24 Q.   In your training as a crime scene officer, have you
25 been, have you submitted evidence for fingerprinting?

Brownstein - Direct (Attias)

1  A.   I can process evidence for fingerprints myself.
2  Q.   And did you fingerprint the vodka bottle that was
3  depicted in 135?
4  A.   No.
5  Q.   Did anyone ask you to do that?
6  A.   No.
7  Q.   You testified that you found shell casings, two shell
8  casings in the kitchen, right?
9  A.   Yes.
10 Q.   Did you ever process those shell casings for
11 fingerprints?
12 A.   No.
13 Q.   Did you handle the weapon after it was recovered?
14    And by that I specifically am asking did you remove the
15 cartridges, the bullets, from the gun?
16 A.   Yes.
17 Q.   To make it safe; right?
18 A.   Correct.
19 Q.   And did you ever process those cartridges for
20 fingerprints?
21 A.   No.
22 Q.   And can you tell the Court if the metal of a cartridge
23 is a -- well, let me ask another question first.
24    Are there certain surfaces that take fingerprints
25 better than others?

Brownstein - Direct - Attias

1   When you walk in the front door of 221 North Street
2   apartment -- first of all, what did we call it Apartment One
3   and Apartment Two, are there more than two -- are there two
4   outside doors at 221 North Street?
5   A.   There is only one outside door for 221 in front.
6   There's one that goes into the back also.
7   Q.   Okay.   221, when you walk up to 221 North Street, is it
8   a house?
9   A.   It's a multi-dwelling.   It has two -- duplex, one is
10  221 and one is 221 and a half.   In Middletown it's common
11  for a building to be split into two separate premises.
12  Q.   And the door for apartment one, is that on the right
13  side as you're looking at the house?
14  A.   Yes.
15  Q.   And when you walk in that front door, what you're
16  calling bedroom one is -- can you just explain just so we
17  are very clear, when you walk in the very front door of 221
18  North Street, where is what you're calling bedroom one?
19  A.   Directly as you walk in to your right.
20  Q.   And is that the door that had the gun strike in it?
21  A.   Yes.
22  Q.   I misspoke.   I'm going to ask you first to look at 110
23  and 111, which are in evidence?
24  A.   Okay.
25  Q.   What do those two photos depict?

Brownstein - Direct - Attias

1   A.   I'm not quite sure what 110 shows other than just the
2   hallway, and 111 shows the floor with a cup that I was told
3   that was a shell casing was near in the apartment.
4   Q.   Officer Brownstein, did you take these photos?
5   A.   I don't know if I took these or other ones.
6   Q.   Was anybody else taking photos from Middletown Police
7   Department that night?
8   A.   That I can't answer.   I don't know.
9   Q.   Well, while you were there was anybody else taking
10  photos?
11  A.   No.
12  Q.   And when you say that 110 shows the hallway, right?
13  A.   Yes.
14  Q.   Okay.   Is that the hallway that leads from the front of
15  the house where bedroom one is back to the kitchen?
16  A.   In this picture it's kind of grainy.   It does appear
17  that way.
18  Q.   And do you have any recollection about how wide that
19  hallway is?
20  A.   No.
21  Q.   I think you can take, if you take a look at the photo,
22  you see there are floor tiles down on the floor?
23  A.   Yes.
24  Q.   I think there were -- how many across are there in the
25  hall?

Brownstein - Direct - Attias

1   A.   Just about three.
2   Q.   Does that help you, can you give us an estimate about
3   how wide that hallway was?
4   A.   I don't know how wide the tiles are.
5   Q.   And did you take any measurements of that hallway?
6   A.   No.
7   Q.   Is that something that you normally do is take
8   measurements inside of a crime scene?
9   A.   Yes.
10  Q.   And why did you not do that in this case?
11  A.   Because it wasn't necessary to take the measurements of
12  the width of the hallway.
13  Q.   Well, there were --
14        MS. ATTIAS:   Withdrawn.
15  Q.   Do you know how long approximately the hallway was from
16  call it standing outside bedroom one to the kitchen?
17  A.   No.
18  Q.   And you did not take measurements of that either?
19  A.   I would have to look to see in my diagram and notes if
20  I took measurements of the length of the hallway.
21  Q.   Well, do you recall taking measurements of anything
22  about the hallway, the kitchen or the bedrooms?
23  A.   Yes.
24  Q.   And what measurements did you take that you recall?
25  A.   I took measurements of the projectile strike in the

Brownstein - Direct - Attias

1   floor in the kitchen to the back door and the height from
2   the floor to the bullet strike in the back door, as well as
3   the bullet strike from the floor to the front door where the
4   bullet went into Apartment One.
5   Q.   The bullet strike in the kitchen?
6   A.   First measurement was, I took was from the bullet
7   strike in the kitchen area to the back door.
8   Q.   The ricochet mark.
9   A.   Yes.
10  Q.   Yes.   Okay.
11  A.   And then the height from the floor to the ricochet on
12  the door?
13  Q.   Okay.
14  A.   And another measurement was the height from the floor
15  to where the entry of the bullet went into room number one
16  or Apartment Number One.
17  Q.   So looking at the door of bedroom number one, you went
18  from floor up to bullet strike?
19  A.   Yes.
20  Q.   And those are the only measurements that you recall
21  taking that evening.
22  A.   I believe so.
23  Q.   Now, when you examined what we've been calling strike
24  A, which is the -- you know what, I'm sorry, I'm going to
25  save that for a moment from now.

149

Brownstein - Direct - Attias

1  A.   I started in 1992 with the City of Middletown.

2  Q.   And can you please describe for us the training that

3  you had in order to do crime scene investigation?

4  A.   I have over a thousand hours of training in crime scene

5  techniques; photography, videography and fingerprint

6  techniques.

7  Q.   And was that state and federal training?

8  A.   Yes.

9  Q.   And any idea about how many crime scenes you've

10  investigated?

11  A.   Over the years, thousands.

12  Q.   I'm going to draw your attention to March 25, 2012.

13  Did you respond to 221 North Street, Apartment One, that

14  early morning?

15  A.   Yes.

16  Q.   And what was it that brought you to the apartment?

17  A.   I was contacted by headquarters, they advised me that

18  there was a shooting where nobody was shot but there was

19  some evidence that needed to be collected.

20  Q.   And did you go over to the apartment on your own or

21  with anybody else?

22  A.   I was by myself.

23  Q.   And before I show you some photographs, I'm going to

24  ask you to please describe from the best of your memory what

25  you did in the apartment that morning.

150

Brownstein - Direct - Attias

1  A.   Okay.  I responded to the scene where I met Sergeant

2  Welch and Officer Sommer who was safeguarding the scene.

3  Nobody else was in the apartment other than Officer Sommer

4  and Sergeant Welch.  When I walked in there, the apartment,

5  room number one was right to my right and there was a

6  kitchen straight ahead with another room towards the back

7  and a back door.

8  Q.   And what was — did you see ballistics evidence in the

9  apartment?

10  A.   Yes, I did.

11  Q.   What evidence did you see?

12  A.   I saw a projectile hole in the door to number one of

13  221 North Street.  I observed two shell casings on the floor

14  in the kitchen area.  I saw a projectile strike in kitchen

15  area going towards the back of the door, back door, and I

16  saw a bullet strike in the back door of the apartment.

17  Q.   Did you recover the gun?

18  A.   Yes.

19  Q.   Where did you recover a gun?

20  A.   It was in room number one.

21  Q.   And what kind of gun was it?

22  A.   It was a .22 semiautomatic pistol.

23  Q.   About how long do you think you spent in the apartment

24  that morning?

25  A.   I am not sure how long it was there?

151

Brownstein - Direct - Attias

1  Q.   Did you take photographs as well as collect the

2  evidence?

3  A.   Yes, I did.

4  Q.   And what type of photographs, what were they

5  photographs of?

6  A.   Of the scene both exterior and interior.

7  Q.   Did you find any bullets in the apartment?

8  A.   No.

9  Q.   And as part of your investigation into bedroom one, did

10  you find any bullet impact marks or terminal marks from a

11  bullet inside that room?

12  A.   No.

13  Q.   I'm going to get back to that strike in a few moments,

14  but first I'm going to ask you to take to look at a few

15  pictures that are already in evidence.  I'm going to ask you

16  first to take a look at Government's Exhibits 110, 111 — I

17  just want to make sure.

18        (Counsel confer)

19  Q.   I'm sorry, that's Exhibits 110, 111 and 226.  Those are

20  in evidence already, Officer.

21        MS. ATTIAS:   Judge, I just want to make sure what

22  I'm showing him is actually in evidence.

23  A.   Okay.

24        THE COURT:   Officer, while they're doing that, you

25  previously testified or referred to a bedroom as bedroom

152

Brownstein - Direct - Attias

1  number one.

2        THE WITNESS:   Yes.  It's the Apartment One on 221

3  North Street.

4        THE COURT:   Okay.

5        THE WITNESS:   It's a duplex building.  You have

6  221 is on your right-hand side, and 221 and a half was on

7  your left.  It was Apartment Number One of 221 North Street.

8        THE COURT:   Okay.  But you went into the apartment

9  and you said you went to or there was a bedroom which you

10  referred to as bedroom number one.

11        THE WITNESS:   It would be the same thing, because

12  there was a multi-kitchen area for the two rooms, so it's

13  probably either room number one or could be known as

14  Apartment One or Apartment Two in the multi-dwelling area.

15  Because it's a common kitchen for that section of the house,

16  the building.

17        THE COURT:   Now you're confusing me.  So, is it

18  one apartment or is it a common area with two different

19  bedrooms that you are referring to as different apartments?

20  A.   Yes.  It has a common area for two different

21  apartments.

22        THE COURT:   With two different apartments.  All

23  right.

24  BY MS. ATTIAS:

25  Q.   Officer, maybe I could help clarify that a little bit.

1   occupants were in sight. Suspect yelled, 'stay mother
2   fuckers.' The people who were in the apartment when the
3   suspect came was Perez, his father, Isidro, Juan and another
4   guy that lived in the apartment. Another person who he
5   doesn't know and Merio was in his room. He never saw the
6   suspect before, and he has only been at the apartment three
7   times. When the guy told him to put his hands up, everyone
8   else realized something was going on. They moved from the
9   center of the kitchen. They were sitting around the table
10  in the kitchen. The suspect fired two shots and he saw the
11  suspect's hand and the gun over his shoulder and he grabbed
12  the arm with the gun and pushed him against the wall.
13          "During the struggle, another shot went off and
14  hit the wall by Juan's door. He yelled to his father to
15  help him. He noticed that his father came up to help, he
16  yelled to Isidro for help, Isidro asked what was going and
17  he said, 'get up here quick.'
18          "During the struggle, Juan's door opened and they
19  fell into the bedroom on the bed. The suspect fell first
20  and he never let go of the gun. He fell on the suspect.
21  Isidro helped him by grabbing the gun. He hit him on the
22  side and put his knee on the suspect back neck area. The
23  gun fell into a laundry basket next to the bed. It stayed
24  there until police arrived. When the guy was on the floor,
25  Isidro and his father was holding the suspect down and he

1   was able to take out his cellphone and call the police. The
2   suspect was yelling while he was on the phone with police.
3   The suspect said that if they let him go he would give them
4   money.
5          "Perez is not sure where Merio was during the
6   incident. Merio wasn't in the kitchen when he went to the
7   bathroom, and he didn't see him during the incident. Perez
8   was not drinking at all that day. Perez stated that he is
9   in the country illegally. He's been in the United States
10  for about three years. He crossed the border from Sonora,
11  Mexico, walked through the desert. Immigration caught him,
12  they processed him and deported him to Mexico. They put him
13  on the bus and sent him back to Mexico. He went to
14  Mexicali, Mexico and came through Calexico, California. He
15  has not had any problems with the law in the United States.
16  He's never used drugs. He has never been with a
17  prostitute.'"
18          THE COURT:   Who is the speaker in that statement?
19  Is that the agent that's speaking?
20          MS. ATTIAS:   I think it's the agent. Mr. Gerber
21  can —
22          MR. GERBER:   Can I clarify, your Honor?
23          THE COURT:   Sure.
24          MR. GERBER:   There was an interview that was
25  conducted. Detective Vasquez was a translator for that

1   interview. Special Agent DiGirolamo was present for the
2   interview and he prepared this report of the interview that
3   was conducted of Mr. Perez.
4          THE COURT:   But it's Mr. Perez that's providing
5   the information.
6          MR. GERBER:   That's correct, your Honor.
7          THE COURT:   Okay.
8          MS. ATTIAS:   And, Judge, I'm going to hand those
9   up to you now.
10         At this time the defense calls Middletown
11  Identification Officer Michael Brownstein.
12         THE COURT:   While he's coming in, what is an
13  Identification officer?
14         MS. ATTIAS:   I would have thought detective, but
15  that's what he's called.
16         MR. GERBER:   Your Honor, he's the CSU officer for
17  the Department. For whatever reason, the internal name is
18  identification officer. That's what it's called.
19         THE COURT:   Okay.
20         MS. ATTIAS:   It's kind of like the whole
21  criminalistics, ballistics thing.
22         THE CLERK:   Please come forward.
23         MICHAEL BROWNSTEIN, having been duly sworn, was called
24  as a witness and testified as follows:
25         THE CLERK:   Please be seated. State your full

Brownstein - Direct - Attias

1   name for the record and spell your name, your full name.
2          THE WITNESS:   Michael S. Brownstein,
3   B-R-O-W-N-S-T-E-I-N.
4   DIRECT EXAMINATION
5   BY MS. ATTIAS:
6   Q.   Good afternoon, Officer Brownstein?
7   A.   Good afternoon.
8   Q.   Is this the first time you've ever been called by a
9   defense attorney?
10  A.   No.
11  Q.   Okay. Oh, good.
12       Officer Brownstein, can you please describe your
13  experience in the police force for the Court?
14  A.   I have 33 years in police work.
15  Q.   And was that all in Middletown?
16  A.   No.
17  Q.   Where else did you work before Middletown?
18  A.   Twenty-eight years in Middletown and five years in Town
19  of Fallsberg in Sullivan County.
20  Q.   By the way, have you and I ever met or ever spoken?
21  A.   No.
22  Q.   This is the first time we're seeing each other;
23  correct?
24  A.   Yes.
25  Q.   When did you start doing crime scene investigations?

141

1  afternoon. I went through the statements with him. I
2  specifically said, Torrell, you understand that this witness
3  statement says that you were holding the gun. He
4  understands that this is one of the men who was inside the
5  apartment when the incident happened and I don't -- I can
6  confirm for you that he completely understands what's going
7  on and is on board with this tactic.
8       THE COURT:   Very well. Just so that I'm clear,
9  there was a testimony last time that there were two
10  Rodrigos, one Rodrigo the son and one Rodrigo the father and
11  Rodrigo the son was the one that was allegedly in the grasp
12  of Mr. Saxon when Mr. Moreria entered the apartment;
13  correct?
14       MS. ATTIAS:   Yes. And these are the statements of
15  Rodrigo son.
16       THE COURT:   The one that was in the grasp,
17  allegedly, of Mr. Saxon when Mr. Moreria entered the
18  apartment.
19       MS. ATTIAS:   Yes. He was the one went to the
20  front door, says he went to the front door, says Mr. Saxon
21  put the gun to his head, and that's where it started. We
22  are calling the younger, the Rodrigo son.
23       THE COURT:   Defense Exhibit B is
24  Mr. Perez-Suarez's statement to the Middletown police.
25       MS. ATTIAS:   Yes.

142

1       THE COURT:   And that's page one of Defense B.
2  Page two of Defense B is the translation of that statement?
3       MS. ATTIAS:   Correct.
4       THE COURT:   Okay.
5       MS. ATTIAS:   "Today at around 12:00 o'clock in the
6  morning I was at 221 North Street, Apartment One, in the
7  dining room with my dad, Rodrigo, Isidro and Juan Moreria
8  chatting. Somebody knocked on the door, and I went to open
9  the door. I opened the door and I saw a black guy about my
10  height but a little bit taller. The black guy said to me,
11  'stay mother fuckers.' The black guy pointed a gun to my
12  head touching my head and I put my hands up and turned
13  around. When I turned around, the black guy lowered the
14  weapon to the right side of my neck. Juan approached me and
15  the black guy shot the gun twice right beside my head. I
16  managed to grab the black guy's hand with both of my
17  hands to try to stop him from shooting again. I screamed,
18  'help me.' While I was holding the black guy's hand, he
19  fired one shot again and shot the door beside the front
20  door. I don't know if the black guy hit me to try to get me
21  off him but I have a bruise on the left side of my face. At
22  that time my dad and Juan arrived to help me. Isidro had
23  gone downstairs to the bathroom before, and that's why he
24  wasn't there at that time. I screamed for Isidro to arrive.
25  I don't know how the bedroom door opened but it opened and

143

1  we fell on top of a bed. The black guy didn't let go of the
2  gun. I clung to the hand with a gun while the other three
3  tried to make the black guy let go of the gun. The black
4  guy let go of the gun and tried to use his strength to
5  escape. Between us we managed to grab the black guy, and
6  wrestling, we managed to get to the floor where we managed
7  to stop him. I was restraining his hands. I called 911 for
8  the police. The black guy told us in English that he would
9  give us money in order for us not to call the police. This
10  happened at the same time that I was on the phone with the
11  police because the lady asked me who was screaming. Officer
12  Artola told me that the name of the black guy who got
13  arrested is Torrell Saxon. I'm at Middletown Police Station
14  and I'm giving this statement voluntarily to Officer Artola
15  who is writing it down for me, and I have read it and it is
16  the truth."
17            And then it just goes on to indicate the penalty
18  of perjury section of the New York State Law.
19            And that, your Honor, is the English translation
20  of the witness' original Spanish statement which is page one
21  of Exhibit B.
22       THE COURT:   Okay.
23       MS. ATTIAS:   Defense Exhibit C is a statement
24  made, and I'm sorry, the date of that statement, Judge, and
25  I'll hand it up as soon as I'm finished reading, is March 25

144

1  at about 4:37 in the morning.
2            Defense C is a statement that Rodrigo Perez-Suarez
3  made to Agent DiGirolamo on September 6. I'm going to just
4  skip the introductory about who it was made to, who it was
5  translated by, but I will indicate that it was translated by
6  a Middletown detective, Jose Vasquez. And I'm going the
7  start at the paragraph three, which is the incident itself.
8            "On the day of the shooting his father" -- "his,"
9  speaking of Rodrigo son:
10            "On the day of the shooting, his father called him
11  to go to Juan's house, Juan Moreria and Antonio Merlo,
12  M-E-R-L-O, lived at 221 North Street. Perez, his father,
13  Isidro and Juan were hanging out at 221 North Street the
14  entire day. Merlo was in the bedroom throughout the day.
15  Perez, his father and Isidro work together. Juan used to
16  work there. They were outside drinking lightly throughout
17  the day. They went inside at approximately nine or
18  10:00 p.m. to eat and drink. Perez was walking up the steps
19  coming back from the downstairs bathroom. He heard the
20  knock on the front door and answered it. He didn't see
21  anyone, swung the door closed and walked away. The suspect
22  pushed the door and rushed up behind him and pointed the gun
23  at his temple. The suspect told Perez to put his hands up.
24  He put his hands up and they started moving inside the
25  apartment. They were at Juan's door when the other

137

```
1   UNITED STATES DISTRICT COURT
2   SOUTHERN DISTRICT OF NEW YORK
                                    -x
3   UNITED STATES OF AMERICA,
4        -against-                  12 Cr. 320 (ER)
5   TORRELL SAXON,
6              Defendant.
7                                   -x
                         United States Courthouse
8                        White Plains, New York
                         April 23, 2013
9
10            CONTINUED FATICO HEARING
11
    Before:
12            HON. EDGARDO RAMOS,
                         United States District Judge
13
    APPEARANCES:
14
    MICHAEL GERBER
15  DOUGLAS BLOOM
              Assistant United States Attorneys
16
17  AMY ATTIAS
              Attorney for Defendant
18
19
20
21
22
23
24  ANGELA A. O'DONNELL, RPR
25  Official Court Reporter
```

138

```
1              PROCEEDINGS
2       THE COURT:  Last we were together, the government
3   had rested and had no additional witnesses; correct?
4       MR. GERBER:  That's correct.
5       THE COURT:  Ms. Attias?
6       MS. ATTIAS:  We had actually gotten past that,
7   Judge.  My expert testified and I called the first officer
8   on the scene, Officer Artola.
9       Before we start, could I ask your Honor to approve
10  a copy of the transcript from today's proceeding?  I don't
11  know that we need it, I certainly don't need it overnight,
12  because I think that we're going to go into sentencing which
13  is down the road a few weeks, but I would like the
14  transcript, perhaps expedited makes most sense.
15      THE COURT:  Certainly, if you'll put in the
16  appropriate paperwork, I'll be happy to so order.
17      MS. ATTIAS:  I tried the paperwork once, I got it
18  wrong.  I'm going to get it right the second time.
19      THE COURT:  I have every confidence that you will.
20  Okay.  Do you have a witness?
21      MS. ATTIAS:  Moving ahead, Judge, the government
22  and I have worked out --
23      (Counsel confer)
24      MS. ATTIAS:  Without objection from the
25  government, Judge, I am introducing what will be defendant's
```

139

```
1   Exhibits B and C.  Exhibits B and C are actual statements
2   made by another one of the occupants of the apartment that
3   until recently I was calling V-1 whose name is Rodrigo
4   Perez-Suarez.  Mr. Perez-Suarez is represented by Chip
5   Calhoun.  Mr. Gerber, Mr. Calhoun and I have spoken several
6   times over the last several days, and without objection we
7   are simply, rather than calling the witness, we are going
8   to, I am going to move his statements in as -- Defense B is
9   the statement that he made to Middletown police the night of
10  the incident.  He originally wrote it in Spanish.  That is
11  also numbered as TS-325.  That's page one of Defense B.
12      THE COURT:  TS-325?
13      MS. ATTIAS:  And TS-326, which is page two of
14  Defense B, is the translation.  I'm going to read the
15  translation into the record at this time and, of course,
16  then hand the exhibit up to you, if there's no objection.
17      MR. GERBER:  There's no objection from the
18  government.
19      Your Honor, there are two issues we just wanted to
20  raise with the Court, and perhaps the Court may wish to
21  inquire of defense counsel or even of the defendant
22  regarding these two issues.
23      One is simply to make clear that Mr. Perez-Suarez,
24  as we understand it, is not, he's not unavailable.  My
25  understanding is he has some sort of medical condition and
```

140

```
1   that would make it more difficult for him perhaps to come to
2   court.  He is not unavailable.  The defense could call him;
3   they are choosing not to.  Instead they want to put in two
4   documents, one his prior sworn statement, the other a report
5   prepared by Special Agent DiGirolamo.  We're not objecting
6   to that, but I wanted to alert the Court to that piece of
7   this.
8       The other point, just to make the Court aware of
9   is that these two statements or two documents the defense is
10  offering, they are both, these accounts by Mr. Perez, they
11  put the gun in the defendant's hand, put the gun in his
12  hand, have him shooting the gun.
13      THE COURT:  I'm sorry, what was that last part?
14      MR. GERBER:  The statements put the gun in the
15  defendant's hand and they have him shooting the gun.
16      THE COURT:  Okay.
17      MR. GERBER:  And the defense is offering these
18  statements.  Again, the government is not objecting, but I
19  wanted to bring this to the Court's attention before they
20  are formally offered into evidence.
21      MS. ATTIAS:  Judge, and actually Mr. Gerber and I
22  have discussed this, and obviously this is a little bit of
23  an unusual defense technique to be introducing a statement
24  that puts the gun in my own client's hands.  Rest be assured
25  I discussed it with Mr. Saxon.  I saw him on Sunday
```